STEINBECK v. BON HOMME MINING CO. et al.

BON HOMME MINING CO. v. STEINBECK et al.

(Circuit Court of Appeals, Eighth Circuit. March 4, 1907.)

(Nos. 2,433, 2,434.)

1. TRUSTS—CONSTRUCTIVE TRUSTS—BREACH OF DUTY BY TRUSTEE.

One who occupies a fiduciary relation to another in respect to business or property, and who by the use of the knowledge he obtains through that relation, or by the betrayal of the confidence reposed in him under it, acquires a title or interest in the subject-matter of the transaction antagonistic to that of his correlate, thereby charges his title or interest with a constructive trust for the benefit of the latter, which the cestui que trust may enforce or renounce at his option.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, § 153.]

2. SAME.

The test of such a trust is the fiduciary relation and a betrayal of the confidence reposed, or some breach of the duty imposed under it. One chargeable with a trust of this nature is a trustee de son tort, and, if he has not been guilty of wrong, he is not such trustee.

3. SAME—EXCEPTION TO RULE—PURCHASE AT JUDICIAL SALE.

There is an exception to the general rule. It is that an agent or trustee may lawfully buy the property of his principal or cestui que trust at a judicial sale caused by a third party, which he has no part in procuring and over which he has no control.

4. SAME—TITLE OF PURCHASER—ESTOPPEL.

The title of a purchaser chargeable with a constructive trust for the benefit of his correlate by reason of their fiduciary relation is not void, but voidable at the option of the cestui que trust only.

The absence of a prompt election to avoid it is an election to affirm it and estops from attack. Inaction for years after discovery of the title raises such an estoppel.

**5. EQUITY—LACHES—LAPSE OF TIME.**

Courts of equity act or refuse to act in analogy to the statute of limitations relating to actions at law of like character. Radical changes in the condition of the property and its speculative character induce them to apply the doctrine of laches in a shorter time than that fixed by the statute of limitations.

Six years' delay in commencing a suit after discovery by a principal of a tax title in its agent to its mining property, which was radically enhanced in value meanwhile by the labor, expenditures, risk, and energy of the holder of the tax title, constitutes fatal neglect, and estops the principal from maintaining the suit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 204, 206, 207.]

**6. TRUSTS—CONSTRUCTIVE TRUSTS—BREACH OF DUTY—LACHES.**

An agent to accept service of process, to care for mining property and its title for a corporation of which he was a stockholder, but without funds of the company to pay taxes, and without authority to advance money for it to pay them or to incur any liability on its account, notified the corporation that its taxes were due and sent it an advertisement of its approaching sale for taxes in 1891. After nearly all of the property had been sold at the tax sale to a stranger, the agent purchased the tax certificate in January, 1892, and on the next day wrote the company of the fact and notified it of the amount required to redeem. He again informed it in August, 1892, of the amount required to redeem and to pay subsequent taxes. The company paid nothing, and made no redemption. He bought the remainder of its property at the tax sale of 1892, and paid the subsequent taxes. In 1894 and 1895 he took and recorded tax deeds. In December, 1896, and in January, 1897, he notified the corporation that he had the tax deeds and had leased the property, and offered to convey his title for a part of the amount he had expended for the tax title and in payment of subsequent taxes, but the company did not accept. The property was unproductive and speculative, and he prospected, developed, and sold it. A lessee under his grantee expended over $20,000 in running a tunnel into it which struck a rich body of ore in December, 1902. The company paid nothing and expended nothing during this time until after the strike, when it made a contract to give a portion of the amount that might be recovered to those of its stockholders who would subscribe to pay the expenses of this suit, and this suit was instituted in March, 1903.

*Held* (1) The agent betrayed no confidence and violated no duty, and was not a trustee for the benefit of the company.

(2) If he had been such a trustee the company by its silence and inaction for six years after January, 1897, when it knew he held the tax title, exercised its election to affirm it.

(3) By its silence for six years after it knew that he held the tax deeds, and had leased the property, it was guilty of such neglect as bars its suit.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Colorado.

The Bon Homme Mining Company, a corporation of the state of Louisiana, owned certain mining claims in the state of Colorado in the year 1888, and appointed James F. Steinbeck, who was one of its stockholders, at a salary of about $100 per month, to develop and operate a mine upon them. It also appointed him its agent to accept service of process upon it in the state of Colorado. Steinbeck operated the mine about 15 months, until October, 1889, when the company directed him to cease business because it had lost all the money it could raise, which was about $20,000. Steinbeck at that time and repeatedly thereafter urged and implored the company to resume and continue

the work of developing this mine; but it refused to do so. He had reported the taxes upon the property for the years 1888 and 1889, and had paid them with money which the company had furnished him for that purpose. During the year 1890 he had received a small amount of money from and paid a few obligations of the company, repaired its buildings, and performed some assessment work upon one of its claims. For these services he received wages. His salary had ceased in October, 1889. On November 5, 1890, his account with the company was balanced and closed. After that date he had no money of the corporation to expend, no authority to pay taxes or any other obligation for it, to incur any liability on its account, to sell, convey, mortgage, lease, incumber, clear of incumbrances, or otherwise affect for it the title to its property or to do anything for it except to care for and protect its property and report its condition as he had theretofore done.

The capital stock of this company was $1,500,000, but only $1,080,000 of this stock had been issued, of which Steinbeck held $125,000 at this time and $289,-500 after November 10, 1891. The company owed $1,500 upon 10 promissory notes for $150 each. It endeavored to sell its bonds and its treasury stock, but was unsuccessful. The stock it had issued was nonassessable. It had no money and no way to raise any, and in this moribund condition it continued until the faith, persistence, and energy of Steinbeck developed in December, 1902, a rich body of ore in one of these claims, when the corporation sufficiently revived to make an agreement to pay a share of the amount that might be recovered for the prosecution of this suit. No meeting of its board of directors was held from July 11, 1892, until February 14, 1903, after the news of the development of this vein had undoubtedly been communicated to the directors of the company.

On April 1, 1890, Steinbeck had written to the secretary of the corporation that the taxes of 1890 were due and were drawing 25 per cent. per annum. In September, 1891, he had sent to the secretary of the company, and the latter had received, the newspaper in which the advertisement of the sale of its property for the taxes for 1890 was published. On October 10, 1891, one Le Fevre purchased all the company's mining claims but one at the sale for the taxes of 1890, and took a certificate of sale thereof. On January 28, 1892, Steinbeck purchased and paid for an assignment of this certificate to himself, and on the next day wrote to the company that he had done so; that the original purchase price of the certificate was $83.19; that he had paid $109.80 for the assignment of it to himself; that it was "particularly urgent that the company take some step to redeem"; that the sale was for the taxes of 1890; that the taxes of 1891 were due and probably amounted to $75 or $80; and that it would require close to $200 to remove the incumbrances. The corporation sent no money, took no step to redeem, and made no answer. On July 23, 1892, the secretary of the company wrote to Steinbeck that he had succeeded in getting a meeting of the board of directors of the company on the 11th, and that he was directed to request him to send his account of all taxes paid on the company's property so that he might be reimbursed for his outlay. On August 15, 1892, Steinbeck answered and specified $210. On August 20, 1892, the secretary wrote him that he had figured up what the proportions of the large stockholders would be; that he had the consent of the New Orleans people to put up $100 toward paying the taxes; that the proportion of Steinbeck and of his brother, who was also a stockholder, would be about $110, and added: "Please draw on the Bon Homme Mining Company for the amount of $100 accordingly." Steinbeck's proportion of the stock of the company was less than three-tenths and his proportion of this $210 was less than $63. He was not responsible for the proportion of his brother; and he declined the offer. In making this offer and subsequent suggestions of this nature the secretary trusted entirely to voluntary action by certain stockholders of the corporation and not to any action or funds of the company; for the stockholders were many, their stock nonassessable, and the company had no funds. Neither the company, the secretary, nor any of the stockholders paid, or offered to pay, the $210 or any taxes upon the property of the company or communicated with Steinbeck about it until December 24, 1896, and then only in answer to a letter of Steinbeck of December 2, 1896. Meanwhile, in November, 1892, Steinbeck had bought at the sale for the taxes of 1891 the re-

maining mining claim which had not been sold for the taxes of 1890. The laws of Colorado allowed the company three years in which to redeem from these sales. It made no redemption, and in December, 1894, Steinbeck took tax deeds upon the sale of 1890. On November 12, 1895, he took a tax deed upon the sale of 1891, and immediately thereafter recorded them. He paid all the subsequent taxes. On December 2, 1896, he wrote to the secretary of the company that he had been paying taxes for a number of years in the hope that the New Orleans people would take hold of the mines again; that he had paid as long as he felt able to do so and had concluded to quit. He added: "I don't suppose that it is any use to give this information. I merely do it to advise any who feel an interest so that they may have an opportunity to save the property in which I am willing to join." On December 24, 1896, the secretary answered that he had lost time to see the principal parties in interest, that he had arranged to have the New Orleans people pay their share of the Bon Homme taxes, and that he would be pleased to receive a statement of the amount Steinbeck had paid and of their proportion of it, including the taxes of 1895, which he requested him to settle. On December 31, 1896, Steinbeck replied that he had paid taxes for 1890 and succeeding years, that he could not then state the exact amount, and wrote: "Under our laws a purchaser becomes entitled to a deed after three years. I have had deeds for some time. Of course, this is not a serious obstacle, for I can deed back to the company. However, I have a suggestion to make upon which I desire your opinion at an early date. There are, no doubt, a number of stockholders who are indifferent and perhaps prevent those who feel inclined to do something. Why not give those who are willing a chance and deed the mine to them only. Lawyers whom I have consulted say they believe tax titles are good. At any rate, should the mines prove profitable, we could effect a favorable compromise. I am willing to do what is fair and just to all-concerned." On January 9, 1897, he wrote: "The ex treasurer who held for nine years back figures the amount at nearly $650 I paid for 1890–91–92–93–94, and 95. However, if the company will refund me $500, I am willing to let the $150 go on my share of the taxes and will see that all that is necessary to be done to clear the title is accomplished. Tomorrow I go up to Bon Homme with two men and a load of provisions. I have leased to H. S. Barrett in a small way. There is but little ore in sight, and if he finds anything it might stimulate the company to action. Barrett and the company can both work without interfering with one another. * * * In the matter of taxes, I think I have made a reasonable proposition and I hope for a speedy acceptance. If there is any dissatisfaction, perhaps I may make further concession. I am willing to do almost anything within the bonds of reason to facilitate a resumption of work on the property." He wrote on January 25, 1897, that the taxes for 1896 became due January 1st and were $40, and added: "Do you think there is any probability that the company would entertain a proposition to bond and lease? If they do not contemplate working themselves, I may wish to make them an offer. I should like a long lease at a reasonable price." The company did not accept the proposition in Steinbeck's letter of January 9, 1897, nor did it answer either of his communications of that month. The next letter it addressed to him was dated March 26, 1901, and it contained the erroneous statements that the secretary did not get from Steinbeck the exact amount of back taxes, that it was for that reason that he could not get from the larger stockholders funds to repay Steinbeck for advances made by him for taxes, and that the secretary knew that the company owed no debts but for taxes to Steinbeck. Meanwhile Steinbeck and Barrett, his lessee, proceeded to prospect and develop the property. From May, 1897, until January, 1898, and again from May, 1898, until November, 1898, they worked underground in the shaft which Steinbeck had begged the company in vain to sink. In the year 1898 Steinbeck caused one Abbott to bring an action, procure a judgment against the company, and to sell the property here in question under an execution against it upon two of its promissory notes for $150 each, which it had never paid. Abbott purchased at the execution sale, received sheriff's deeds, and conveyed the property to Steinbeck.

On July 19, 1900, Steinbeck resigned his agency to accept service of process in Colorado for the company. On August 27, 1900, he commenced a suit in

one of the courts of Colorado against the company and others to quiet the title of the property in himself, and on December 3, 1900, obtained a decree to that effect upon a service of the summons by publication. On July 14, 1900, Steinbeck made an agreement to sell this and some other property to L. F. Twitchell for $45,000, to be paid in installments during 26 months; that he would execute deeds and place them in escrow with the bank; that the purchaser would pay the purchase price; and that until it was fully paid he would cause a mine upon the property to be continuously worked and would apply the profits of its operation to the payment of the purchase price. Twitchell assigned this contract to the Scantic Gold Mining & Milling Company. In October, 1900, Steinbeck placed the deeds in escrow with the bank to be delivered on payment of the purchase price. On February 3, 1902, the Scantic Company leased the property to the Bon Homme Mining & Development Company on condition that it should drive a certain cross-cut tunnel then about 1,000 feet in length 700 feet farther unless the Bon Homme vein was intersected at a less distance, and that it would continuously work the property. The development company drove the tunnel until in December, 1902, it intersected the vein and disclosed a rich body of ore, and it still continues to work the mine. Before this suit was commenced it had paid to Steinbeck upon the purchase price $23,706.56, to the Scantic Company, its lessor, $6,-632.67, and $26,770.38 for driving the tunnel for the development of the property, in all $57,109.61.

The intersection of the vein by the tunnel was heralded as a great mining strike in the Denver newspapers and other publications, including some of the mining journals, and on March 6, 1903, the Bon Homme Company exhibited its bill and subsequently amendments thereto in the court below against Steinbeck, the Scantic Company, the development company, and others to quiet its title to the property it owned in 1888, to avoid the tax deeds, the sheriff's deeds and the decree to quiet the title in Steinbeck upon the ground that they were secured by fraud, and for other relief. Issues were joined, testimony was taken, and the decree was that the Scantic Company should pay into court $8,000 which still remained owing to Steinbeck on account of the purchase price of the property and should hold the title, and that Steinbeck should pay to the Bon Homme Company the $37,000 he had received on account of the sale of the property less $1,679.67 which he had paid on account of the taxes upon it. The Bon Homme Company has appealed because the court did not grant it a recovery of the property and its title, and Steinbeck has appealed because it adjudged that he should pay over to the complainant the part of the purchase price which he had collected.

Branch H. Giles, for Steinbeck.

Charles E. Fenner and Charles K. Phillipps (Charles Payne Fenner, on the brief), for Bon Homme Mining Co.

L. F. Twitchell (Frank C. Goudy, on the brief), for Scantic Gold Mining & Milling Co. and others.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This suit was instituted to avoid the tax title, the sheriff's deeds, and the decree which quieted the title in Steinbeck, upon the ground that the latter had obtained these claims of ownership by deceit and fraud. These three sources of title may be considered in their order; and the first question the case presents is whether Steinbeck was guilty of any fraud or breach of duty in his procurement and assertion of the title in himself under the tax certificates and deeds. The material facts which condition this issue have been set forth. They not only fail to disclose any indication of deceit, concealment, or misrepresenta-

152 F.—22

tion while he was obtaining the tax deeds and subsequently until the company and its stockholders in 1897 failed to accept his offer to convey the tax title to them for the amount of money which he had expended to procure it and to pay the subsequent taxes upon the property, but they demonstrate the utmost good faith on his part until, by their silence and inaction, the company and its stockholders had exercised their option to decline to share with him the burdens, risks, and possible benefits of his title under the deeds.

But counsel for the complainant invoke the general rule that one who occupies a fiduciary relation to another in respect to business or property, and who by the use of the knowledge or interest he obtains through that relation, or by the betrayal of the confidence reposed in him under it, acquires a title in the subject-matter of the transaction antagonistic to that of his correlate, thereby charges his title or interest with a constructive trust for the benefit of the latter which the cestui que trust may enforce or renounce at his option, and they insist that under this rule Steinbeck's title was charged with a constructive trust in favor of the company. The rule is wise and salutary, and it should be carefully and rigorously enforced in all cases to which it lawfully applies. But, like every rule and principle of the law, it is founded in a controlling reason which is its life, and, where the reason ceases, the rule is impotent. The reason is that no one may profit by a betrayal of the confidence of his correlate and by the use, to the latter's detriment, of knowledge or interest acquired by means of the fiduciary relation. The test of the existence of a constructive trust of this nature is the fiduciary relation, and the betrayal of the confidence reposed under it to acquire the property or interest of the correlate, and, in the absence of either of these indispensable elements, no such trust can arise. Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176.

An agent to sell is prohibited from buying the property of his principal at his own sale; but, if he discloses all his information and acts in good faith, he may purchase it directly of his principal or at a judicial sale which he cannot and does not procure or control. General statements from text-books and many authorities have been cited to the effect that a general agent to care for property or to pay taxes upon it takes any tax title he acquires in trust for the owner (1 Am. & Eng. Enc. of Law [2d Ed.] p. 1085; Blackwell on Tax Titles, § 598; Bartholemew v. Leech, 7 Watts [Pa.] 472; Bowman v. Officer, 53 Iowa, 640, 6 N. W. 28; McMahon v. McGraw, 26 Wis. 614, 623; Ellsworth v. Cordrey, 63 Iowa, 675, 679, 16 N. W. 211; Gonzalia v. Bartelsman, 32 N. E. 532, 143 Ill. 634; Continental Life Ins. Co. v. Perry & Townsend, 65 Iowa, 709, 22 N. W. 937; Page v. Webb [Ky.] 7 S. W. 308); but these cases are not inconsistent with the reason and the rule that some betrayal of confidence, some breach of duty, some bad faith, some abuse of the fiduciary relation is indispensable to the creation of such a trust. A constructive trust of this nature is the creation of a court of equity. But such a court never raises it unless the holder of the title has been guilty of some breach of duty; for "a court of equity can act only on the conscience of a party. If he has done nothing that taints it, no demand can

attach upon it so as to give any jurisdiction." A purchaser chargeable with such a trust is a trustee ex maleficio or a trustee de son tort, and, if he has been guilty of no wrong, he is no trustee. Boone v. Chiles, 10 Pet. 177, 209, 9 L. Ed. 388; U. S. v. Detroit Timber & Lumber Co., 131 Fed. 668, 678, 67 C. C. A. 1, 11; U. S. v. Northern Pac. R. Co., 95 Fed. 864, 880, 37 C. C. A. 290, 306; Kinne v. Webb, 54 Fed. 34, 39, 4 C. C. A. 170, 175; U. S. v. Winona & St. Peter R. Co., 67 Fed. 948, 960, 15 C. C. A. 96, 108.

If one is employed by the owner of property to pay taxes upon it, and if he accepts the employment and pays them with his own funds, his purchase of a tax title upon the property without notice, or an offer to convey it to the owner, is a breach of his contract and of his duty and a betrayal of the confidence of his principal; and it charges his title with a constructive trust for the latter's benefit. The cases cited by counsel for the complainant are of that nature. Thus in Bowman v. Officer, 53 Iowa, 640, 6 N. W. 28, the agent accepted a power of attorney "to take charge of, lease, pay taxes, sell and convey by deed of warranty all or any portion" of the lands. He had paid taxes to the amount of hundreds of dollars and charged the account of his principal. He purchased at a tax sale for the taxes of a single year and subsequently continued to collect and expend money on account of the lands for his principal. The court rightly held that the tax title he procured was secured by a betrayal of the confidence reposed in him and a breach of his duty to protect the property of his principal. In cases of this character the principal incurs a personal liability for the money which the agent advances, a liability upon which the agent may maintain an action, and may subject the property itself to its payment. But no case has come to notice in which the principal neither furnished the agent the money nor the means to pay the taxes, nor subjected himself to legal liability to reimburse him for the moneys he might advance to pay them, in which the agent carefully notified the principal of the taxes due, of their delinquency, of his purchase of a title based upon them, and offered to convey it to him for the money he had expended, and the principal exercised his option to refuse the offer, where any court has held the tax title to be charged with a constructive trust for the benefit of the original owner.

On the other hand, there is an exception to the general rule that one who occupies a fiduciary relation may not lawfully purchase the property of his correlate for his own benefit, as well established as the rule itself. It is that an agent or trustee may lawfully buy the property of his principal or cestui que trust at a judicial sale caused by a third party which he has no part in procuring, and over which he can exercise no control. Allen v. Gillette, 127 U. S. 589, 596, 8 Sup. Ct. 1331, 32 L. Ed. 271; Eckrote v. Myers, 41 Iowa, 324; Twin-Lick Oil Co. v. Marbury, 91 U. S. 591, 23 L. Ed. 328; Prevost v. Gratz, 19 Fed. Cas. 1303, 1309, No. 11,406; Fisk v. Sarber, 6 Watts & S. 18; Chorpenning's Appeal, 32 Pa. 315, 316, 72 Am. Dec. 789.

In Allen v. Gillette, 127 U. S. 589, 596, 8 Sup. Ct. 1331, 32 L. Ed. 271, one of the executors of the will of a decedent purchased the interest of one of the devisees at a trustee's sale under a trust deed made

by the devisee to secure the payment of her debt to a third party. She brought suit against the executor to charge the title purchased by him with a constructive trust in her favor and to redeem from it. The Supreme Court held that the executor owed the devisee no duty incompatible with his purchase and dismissed the bill.

In Eckrote v. Myers, 41 Iowa, 324, a firm of attorneys was employed to foreclose a mortgage upon real estate. They brought the suit, carried it to a decree, and notified their client that no sale would be made under the decree until he paid the fees that would accrue in the sale. They had demanded expenses previously made and fees for prior services, and he had failed to pay them. He paid nothing and the suit remained pending. A year or two later there was a sale of the mortgaged premises for taxes, and the attorneys bought, notified the client of the purchase, demanded reimbursement of the money expended therefor and the payment of prior advances and fees. The title matured in one of the members of the firm, and the client brought suit to set aside the tax deed and for an accounting. The court held that the attorney had rights as well as the client, that the same rules of honesty and fair dealing govern both, and dismissed the suit.

In Chorpenning's Appeal, 32 Pa. 315, 316, 72 Am. Dec. 789, a guardian purchased the land of his ward at a judicial sale of it under a judgment against the administrator of the estate of the ward's father. The guardian had no money of the ward with which to make the purchase and none in expectancy. The court said:

"The doctrine that a party will not be allowed to purchase and hold property for his own use and benefit, when he stands in a fiduciary relation to it, if contested by the party entitled as cestui que trust, is indisputable. * * * The relation, however, must be one in which knowledge, by reason of the confidence reposed, might be acquired, or power exists to affect injuriously the interests of cestuis que trust, or advance that of the trustee. The reason of the law is its life, and, unless some advantage might be gained by reason of the relation, the principle does not apply."

And the court sustained the purchase.

Concede that Steinbeck was the agent of the Bon Homme Company to accept service of process upon it, to care for the property and its title, to report the taxes upon it, to do any acts regarding it which the company directed him to perform, and that he was a stockholder and director of the corporation, and the record discloses no more general agency, nevertheless the company never authorized him to advance any money to pay its taxes or to subject it or its property to any legal liability for such advance or payment, and it never furnished him any funds after December 5, 1890, for this purpose or to reimburse him for any of the moneys he expended in purchasing the certificates or the tax deeds. There was therefore no duty imposed upon him to pay the taxes or to buy the tax titles for the company, and he would have incurred no liability to it if he had done neither and the property had been sold to a stranger. He did not cause, and he could not control, the tax sales. They were procured by the state, and he was not disqualified by their character from purchasing the property of his principal either at them or under them. He acquired from his agency no knowledge or advantage in

STEINBECK V. BON HOMME MINING CO.341

making such purchases which strangers and the company itself did not possess. He secured no power by means of his agency to affect injuriously by his purchases the title of his principal. On the other hand, his purchases and his offer in 1897 to convey his title for its cost beneficially affected the title and the rights of his principal. They gave the company an opportunity to acquire the property free from tax titles many months after the time when an absolute title would otherwise have vested in a stranger. The fact that he was a stockholder and director did not disqualify him from securing in good faith and with full notice which he gave to the company, a lawful incumbrance upon, and title to its property. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 591, 592, 23 L. Ed. 328. The only confidence reposed in him by his agency here which he might have betrayed was that he would give timely notice of the taxes and incumbrances and apply any moneys the company remitted to him to discharge them. If he had betrayed that confidence, if he had silently procured a tax title for his own benefit, and refused to transfer it to the company or to share it with the stockholders for its cost, he might have been chargeable as a trustee; but he notified the company of the taxes of 1890 in April, 1891, sent it the advertisement of the sale in September, 1891, wrote it of the sale to Le Fevre, of his purchase of the certificate, that it "was particularly urgent · that the company should take some step to redeem," of the amount required to do so, and of the taxes of 1891 on January 29, 1892, the day after he bought the certificate, again informed it of the amount required on August 15, 1892, and in December, 1896, and January, 1897, wrote the corporation that he had taken tax deeds of the property and had made a lease of it to Barrett, but offered to convey his title to the company or to the principal stockholders for $500, their proportion of the $650 which he had expended to procure and preserve it, and that he hoped for a speedy acceptance of his proposal. Here was no betrayal of confidence, no breach of duty, no use of his fiduciary relation to secure the title of his principal for his own benefit, but fair dealing, full notice, and the utmost good faith. It is not because Steinbeck failed to discharge his duty, but because the company exercised its option not to take the burden and the risk of this title which he offered it that it does not own it now.

It is contended that by his letters Steinbeck admitted that he held the tax title in trust for the corporation and to secure the payment of the amount he had expended for it, and in support of this argument attention is called to the fact that in some of his letters he wrote that he had paid the taxes for the years, among others, for which the sales were made, and that in his letter of January 25, 1897, he inquired whether the company would bond and lease the property and wrote that he would like a long lease at a reasonable price. But it is evident that the last remark was induced by the statement of the secretary in his letter of December 24, 1896, that he had arranged to have the New Orleans people pay their share of the Bon Homme taxes, and by Steinbeck's baseless hope and mistaken belief that his proposition of January 9, 1897, to clear up the title of the property for $500 would be accepted. His inquiry was not an admission that

the company owned the property, but that it would own it if it accepted his proposition to convey it as the secretary had written him he had arranged to do. Nor was his statement that he had paid the taxes an admission that he had not purchased, and did not hold his tax title for his own benefit; nor did it mislead or deceive the company, because he had carefully informed it that he held the tax deeds in his own name, that he had himself leased the property to Barrett, and they knew that he had proposed to convey the title under the tax deeds to it or to the principal stockholders for a fixed consideration, and that he had written them that lawyers whom he had consulted said that they believed that tax titles were good. The acts, letters, and circumstances of these parties must have a rational interpretation. They must be presumed to have intended what men of their intelligence ordinarily mean in similar circumstances. Tax certificates and tax deeds are not indications of loans or of their security. They evidence title accruing or accrued. Even when the title under them is charged with a constructive trust, they result in security for their cost, not because they were so intended, but because equity conditions its relief with the payment of the expense of the title under them on the maxim that he who seeks equity must do equity.

Nor is the fact that the holder of a tax title offers to sell it to the original owner for its cost any indication that the former holds it in trust for the latter. The tax title of Steinbeck was not charged with any direct or express trust. His notice of January 29, 1892, that he had purchased the tax certificate, his notice of August 15, 1892, that $210 was required to redeem from it and to pay subsequent taxes, his taking and recording of his tax deeds, his statements in his letter of December 31, 1896, that a purchaser became entitled to a deed after three years; that he had had deeds for some time; that he could deed back to the company; that he was ready to convey to the company or to those stockholders only who were willing to take a chance, upon payment of a part of the cost, his letter of January 9, 1897, that he had expended $650 in payment of the taxes; that if the company would refund $500 he was willing to let $150 go on his share, and would "see that all that was necessary to be done to clear the title was accomplished"; that he had leased to Barrett; that "in the matter of the taxes I think I have made a reasonable proposition and I hope for a speedy acceptance. If there is any dissatisfaction perhaps I may make further concession. I am willing to do almost anything within the bonds of reason to facilitate a resumption of work on the property," and the facts that the company knew all that has been recited and neither accepted his offer nor asked further concessions—converge with compelling force to prove that Steinbeck intended to buy and actually secured this tax title for his own benefit only and that it was never subject to any express trust in favor of the company. No proposition to convey for a consideration to the company or to the stockholders who would take a chance, no terms of conveyance were pertinent or necessary if he held the title in trust for the benefit of the corporation. A simple declaration of that fact would have been the natural and

probable evidence of it. No such declaration or admission can be found in the record. The only trust with which the property could be charged was therefore a constructive trust arising from the fiduciary relation, and, as he was guilty of no betrayal of confidence, no abuse of his fiduciary relation, and no breach of duty in acquiring or holding it and the failure of the corporation to secure it resulted only from its refusal to accept his offer to convey it, this title was not chargeable with any constructive trust for the benefit of the corporation.

There are other rules of law which interpose serious obstacles to a recovery by the Bon Homme Company in this suit if this title were chargeable with such a trust. It was not subject as we have seen to any express or direct trust, and hence it does not fall under the rule that no time runs against a trust until it is repudiated.

But the title of a purchaser chargeable with a constructive trust for the benefit of his correlate by reason of their fiduciary relation is not void, but voidable at the option of the cestui que trust only, and the absence of a prompt affirmative election to avoid it confirms it. "It is only voidable, and, as it may be confirmed by the parties interested directly, so it may be by long acquiescence or the absence of an election to avoid the conveyance within a reasonable time after the facts come to the knowledge of the cestui que trust." Hammond v. Hopkins, 143 U. S. 224, 250, 12 Sup. Ct. 418, 36 L. Ed. 134.

Four years after a stockholder and director of a corporation had purchased its property under a deed of trust made to secure a debt to him the corporation brought a suit to charge the title with a trust in its favor. The purchaser had made the statement to other stockholders that he only designed to purchase for the corporation, and there was testimony that after the sale he offered to relinquish his purchase if his debt was paid. The Supreme Court said:

"The doctrine is well settled that the option to avoid such a sale must be exercised within a reasonable time. * * * Though not falling exactly within the rule as to time for rescinding, or offering to rescind, a contract by one of the parties to it for actual fraud, the analogies are so strong as to give to this latter great force in the consideration of the case. In this class of cases the party is bound to act with reasonable diligence as soon as the fraud is discovered, or his right to rescind is gone. No delay for the purpose of enabling the defrauded party to speculate upon the chances which the future may give him of deciding profitably to himself whether he will abide by his bargain, or rescind it, is allowed in a court of equity."

And the court dismissed the bill. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 592, 23 L. Ed. 328; Harwood v. Railroad Co., 17 Wall. 78, 21 L. Ed. 558; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855; Galliher v. Cadwell, 145 U. S. 368, 373, 12 Sup. Ct. 873, 36 L. Ed. 738.

Counsel for the company endeavor to avoid the effect of this principle because Steinbeck never demanded payment of the amount he had expended for his tax title and in payment of the subsequent taxes, and they insist that no time ran against the company because such a demand was not made. If the company had been legally liable to pay the amount which Steinbeck expended for his title and in payment of taxes, there would be more reason for this contention. In that case the company might have had a right to redeem reciprocal with his

right to enforce payment. But the company was not liable to repay to Steinbeck the money he expended, and the only right the company had was not the right to redeem from the tax sale, but the right to exercise its election to avoid it by paying its cost, or to affirm it and abandon the property. Nor could it avoid that election either by silence or by inaction after it had received the knowledge that Steinbeck held the tax deeds and the title under them, because delay, vacillation, an attempt to speculate upon the option, to await the event and thereafter to avoid, if the property has advanced in value, and to affirm, if it has depreciated, is fatal to the option, and affirms the sale. The Bon ·Homme Company knew the facts which conditioned its right to elect to avoid this tax title in January, 1897. Steinbeck then offered to convey it for a part of its cost. The company failed to accept and thereby rejected that offer. Steinbeck leased the property, operated it, sold it, caused the expenditure of tens of thousands of dollars upon it and the development of a body of ore which transformed land of such a character that its owner would not pay taxes upon it nor redeem it from tax sales into a productive and valuable mine, and then more than six years after it had learned every fact material to its right this company by the institution of this suit sought to exercise its option to avoid this tax title. It was too late. The law had exercised its option. Its speculation upon it, its inaction, its failure to share the heavy burden of the property, its care and operation during the tedious 90's affirmed the title of Steinbeck and estopped it from sharing the benefits his care and toil and money had earned.

Finally, section 2912 of Mills' Annotated Statutes of Colorado provides that:

"Bills of relief in case of the existence of a trust not cognizable by the courts of the common law * * * shall be filed within five years after the cause thereof shall accrue and not after."

If this tax title was chargeable with any trust, it was with a constructive trust not cognizable by the courts of the common law. The cause of action to enforce it accrued in January, 1897, and such an action was barred in the courts of Colorado before this suit was instituted. Courts of equity are not bound by, but they usually act or refuse to act in analogy to the statute of limitations relating to actions at law of like character. Radical changes in the condition and value of the property and its speculative character often induce them to apply the doctrine of laches in a shorter time than that fixed by the statute of limitations for similar actions at law. Kelley v. Boettcher, 29 C. C. A. 14, 21, 85 ·Fed. 55, 62; Lemoine v. Dunklin Co., 2 C. C. A. 343, 348, 51 Fed. 487, 492. Lord Camden said:

"A court of equity which is never active in relief against conscience or public convenience has always refused its aid to stale demands, when the party has slept upon his right, and acquiesced for a great length of time." Smith v. Clay, 2 Amb. 645.

"If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He cannot be allowed to remain passive,

prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage." Kerr, Fraud & Mistake, p. 306.

"The reason upon which the rule is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect. In other words, where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, or that the intervening rights of third parties may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect." Penn. Mutual Life Ins. Co. v. Austin, 168 U. S. 685, 698, 18 Sup. Ct. 223, 42 L. Ed. 626.

In Patterson v. Hewitt, 195 U. S. 309, 321, 25 Sup. Ct. 35, 49 L. Ed. 214, the complainants had transferred their interests in certain mining claims to a trustee who had made a written agreement of trust to convey their interests in the property, which amounted to one-fourth, to them upon the performance of certain conditions, and those conditions had been performed in 1884. One of the complainants demanded his deed in 1885 and another just before the commencement of suit in 1903. The analogous statute of limitations was 10 years. During the eight years just preceding the suit the trustee and his associates had performed a large amount of work in developing the mine to which the complainants did not contribute, and a large body of rich ore was discovered in 1890. The Supreme Court said:

"If appellants had expected a share in this property, they should either have brought a bill promptly to enforce their rights, or at least contributed their proportionate share to the subsequent work and labor, and the expenses then incurred. To award them now a deed to their original interest in the property would be grossly unjust to the defendants, through whose exertions the value of the property was discovered and the mine put upon a paying basis. While it is true the court might impose upon the appellants the payment of their proportionate share of labor and expenses as a condition of relief, it could not compensate the defendants for the risk assumed by them that their exertions would come to naught. There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which to-day may have no salable value may in a month become worth its millions. Years may be spent in working such property apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstances persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

And the decree which dismissed the bill was affirmed. Stout v. Rigney, 107 Fed. 545, 549, 46 C. C. A. 459, 463; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855; Speidel v. Henrici, 120 U. S. 377, 387, 7 Sup. Ct. 610, 30 L. Ed. 718; Kinne v. Webb (C. C.) 49 Fed. 512; Societe Fonciere v. Milliken, 135 U. S. 304, 10 Sup. Ct. 823, 34 L. Ed. 208; Galliher v. Cadwell, 145 U. S. 368, 375, 12 Sup. Ct. 873, 36 L. Ed. 738; Alsop v. Riker, 155 U. S. 448, 460, 15 Sup. Ct. 162, 39 L. Ed. 218.

The land in controversy here was a prospective mine, property of the most speculative nature. While it was unproductive, while

its value was doubtful, and the burden of protecting it against taxes and tax titles and the labor of developing it were heavy and the benefits to be derived problematical, the complainant refused to share either. For more than eight long years when times were hard, and the burden of caring for and protecting this property exceeded the benefit, Steinbeck bore it alone. Now, after he has prospected and operated the property, after he has bought the tax titles upon it and paid subsequent taxes, after grantees and lessees whom he secured have developed the rich ore and the benefit exceeds the burden, the complainant, which has refused to bear or to share the burden or the risk, prays a court of equity to confer upon it the reward which the money, the toil and the energy of Steinbeck have earned. There is no equity in such a suit. The complainant speculated upon its option. If the expense, toil, and effort of Steinbeck had come to naught, it would never have reimbursed him or have brought this suit. Its neglect, inaction, and silence during the six years after it knew he had a tax title to its property and the marvelous change in its value meanwhile estop it from maintaining this suit and compel a dismissal of its bill.

As Steinbeck's title under the tax deeds is impregnable to attack in this suit, it is not material whether or not his title under the sheriff's deeds and his decree quieting the title in himself were wrongfully obtained. They did not in any event impair his tax title, and they cannot affect the result of this suit. They will not therefore be further considered.

The decree below is reversed, and the case is remanded to the Circuit Court with instructions to dismiss the bill.