NORTHERN OIL &, GAS COMPANY v. K. B. BIRKELAND AND ANOTHER.[1]

No. 24,667.

April 9, 1925.

**Notice of appeal must be filed within statutory time—Relief against other mistakes.**

1. The notice of appeal must be served within the time provided by statute. If so served the court may for cause shown relieve the appellant from a mistake in failing to file the appeal bond and pay the fee on appeal within the prescribed time.

**Appellant relieved from failure to file appeal bond.**

2. The showing made by appellant is such as to justify relief from a failure to file the appeal bond and pay the appeal fee in time.

October 23, 1925.

**On court's own motion briefs stricken from its files which attacked fairness, honesty and ability of trial judge.**

3. This court will on its own motion strike from its files and refuse to consider briefs which attack the fairness, honesty or ability of the trial court, since such attacks in no sense aid in a proper determination of the appeal, but serve to lower the professional standard of the attorneys who indulge therein from that required of officers of the court. As offending in this respect the briefs of the appellant are stricken from the files and records of the case.

[1]Reported in 203 N. W. 228, 205 N. W. 449, 206 N. W. 380.

December 4, 1925.

**Evidence sustained finding defendant was not precluded from bidding in plaintiff's property at foreclosure sale.**

4. The evidence sustains the findings to the effect that when defendant K. B. Birkeland bought plaintiff's property at a mortgage foreclosure sale he stood in no fiduciary relationship to plaintiff which interfered with his purchasing for his own use; and that no duty or obligation of defendant to plaintiff precluded him from acquiring the lease to a ten acre tract in the Burkburnette territory as his own.

**Other findings or matters outside settled case not considered.**

5. Those findings control a decision; and other findings challenged, and findings requested of contrary import will not be considered, nor matters not incorporated in the settled case.

**Essentials of constructive trust.**

6. In order to lay claim to property under a constructive trust there must not only be a confidential relation between the parties involved, but some duty or obligation of the one sought to be charged as fiduciary in respect to the property claimed.

**No error in allowing statutory cross-examination of witness or abuse of discretion.**

7. No prejudice resulted from defendant's being permitted to call a witness for cross-examination under the statute, even if it be conceded that such witness was not then an officer of plaintiff; and in the court's ruling that a proper foundation had not been laid for the introduction of secondary evidence of the contents of a letter there was no abuse of judicial discretion.

1. See Appeal and Error, 3 C. J. p. 1073, § 1081; p. 1232, § 1336.
2. See Appeal and Error, 3 C. J. p. 1073, § 1081.
3. See Appeal and Error, 3 C. J. p. 1432, § 1595.
4. See Corporations, 14a C. J. p. 153, § 1929.
5. See Appeal and Error, 4 C. J. p. 650, § 2541 (Anno).
6. See Trusts, 39 Cyc. p. 185.
7. See Appeal and Error, 4 C. J. p. 814, § 2785; p. 960, § 2941; Evidence, 22 C. J. p. 1052, § 1352.

Action in the district court for Hennepin county for an accounting. The case was tried before Montgomery, J., who ordered judg-

ment in favor of defendants. Plaintiff's motion for a new trial was denied. Plaintiff appealed from the judgment. Motion to dismiss appeal denied. Affirmed.

*H. E. Fryberger* and *Olof L. Bruce,* for appellant.

*Einar Hoidale* and *George S. Grimes,* for respondents.

On April 9, 1925, the following opinion was filed:

DIBELL, J.

Motion to dismiss the appeal of the plaintiff from a judgment in favor of the defendants.

1. One ground of the motion is that the bond and fee on appeal were not filed within the time fixed by the statute.

The statute requires that an appeal shall be made by the service of the notice on the adverse party and on the clerk. To make it effective the party appealing must file the notice and bond on appeal with the clerk of the court below and pay the appeal fee within the time provided, which, in case of an appeal from a judgment, is six months from its rendition. When a party in good faith gives notice of appeal and omits through mistake to do any other act necessary to perfect it the court may permit an amendment on such terms as may be just. G. S. 1923, § 9492. The provisions of the statute are quoted more at length in Wheeler v. Crane, 141 Minn. 78, 169 N. W. 476, 597.

The judgment was entered on July 1, 1924, and the notice of appeal was served and filed on December 30, 1924. The bond was not filed and the clerk's fee was not paid until January 6, 1925. In Wheeler v. Crane, 141 Minn. 78, 169 N. W. 476, 597, the appellant did not pay the appeal fee until after the lapse of time for appeal. He made no claim of mistake, offered no excuse, and the appeal was dismissed upon the ground that he did not bring himself within the provision authorizing relief in the case of mistake. After the dismissal the appellant applied to be relieved of his default. It was held that the facts presented did not justify relief. In Baxter v. The Orinoco Co. Ltd. 158 Minn. 530, 197 N. W. 219, payment of the appeal fee was not made in time and the appeal was dismissed.

Later the appellant moved for relief from his default, suggesting mistake, and upon consideration of the merits his motion was denied. Baxter v. The Orinoco Co. Ltd. 160 Minn. 535, 202 N. W. 829. The result of these cases is this: If the notice of appeal is served in the way and within the time provided by the statute, relief may be given from a failure through mistake to file the notice or appeal bond or pay the appeal fee within the time fixed.

2. The showing of counsel in proof of mistake is not satisfactory. At the best counsel were neglectful. They claim to have divided the labor and each proceeded upon the theory that a certain part was done by the other. There is a suggestion that it was not thought necessary to file the bond and pay the fee immediately. This weakens rather than helps their story. The parties had considerable controversy after the trial, there was trouble over costs and in settling the case, and perhaps some misunderstandings. A paper book of 1,150 pages was filed on January 24, 1925, and the motion to dismiss was not made until February 19, 1925. No prejudice has resulted. We conclude that appellant should be relieved of its default.

A further ground of the motion to dismiss is that the plaintiff corporation has been dissolved by a decree of a court of Texas under the laws of which it was organized. This ground of motion is reserved for consideration when the case is heard on the merits.

Motion to dismiss appeal denied.

On October 23, 1925, the following opinion was filed:

PER CURIAM.

In examining the brief and reply brief of appellant we find statements reflecting on the ability and integrity of the trial judge, which we cannot permit to go unnoticed. We quote some of them:

"The trial court evidently does not grasp the facts or the law of the case. * * *. When we therefore read paragraph 10 of the findings or apology of the trial judge, we note * * *. But it never seemed to occur to the trial judge in his various apologies for Birkeland that his findings were inconsistent with each other or

with the evidence   *   *   *.   In fact as the record shows the more falsehoods that Birkeland told and the more preposterous those falsehoods were, the more devotedly did the trial judge seem to cling to and hang upon Birkeland's words and this irrespective of the fact that Birkeland was contradicting himself from one end of the trial to the other and in every way imaginable.   *   *   *   The record discloses that we are justified in regarding with misgiving the findings and conclusions of law and the order of the trial judge denying our motion for amended findings.   *   *   *   And the record does show clearly that the trial judge was unable to distinguish between probability and improbability; or between truth and falsehood; or between right and wrong; and that he was not able to reason from cause to effect, and that apparently he had no conception of the law of the case.   The very term 'judge' is supposed to imply discrimination, judgment, knowledge and experience and especially a keen knowledge of the difference between right and wrong.   When he fails to display any of these qualifications, what weight can be attached to any of his findings?   From our standpoint, a judge who cannot see is very much the same as a judge who will not see, and besides how can we distinguish between the two?   In either case, justice is thwarted.   It is indeed disheartening to deal with a case such as this."

And in the reply brief we find this: "Reference is made to the alleged findings of the court found at record, page 1144, folios 3430-1, in which the trial court gratuitously and in violation of the stipulation of the parties and of his own rulings at the trial   *   *   *   proceeds to make an alleged finding that   *   *   *.   We submit that this is an outrageous thing."

The findings bear evidence of painstaking consideration of voluminous testimony; and attacks of the sort indicated by the above excerpts upon the ability, good sense and common honesty of the trial judge are not to be tolerated in the files of this court.   In no sense can we be aided in determining the questions involved in an appeal by belittling or abusing the judge below.   Such attempts to belittle a judge of our courts are unworthy of the members of an

honorable profession who are the officers of the court. Therefore, on our own motion, the offending briefs are stricken from the files with leave to appellant to file within 20 days from the date hereof proper briefs. In case of failure to serve and file other briefs within the time herein fixed a motion to affirm or dismiss the appeal will be entertained.

On December 4, 1925, the following opinion was filed:

HOLT, J.

Plaintiff appeals from a judgment entered in favor of defendants, husband and wife.

The theory of recovery, as disclosed by the pleadings and the conduct of the trial, may be stated to be that the defendant K. B. Birkeland bid in plaintiff's property, known as the DuBois lease at a foreclosure sale for plaintiff and should account for its subsequent operation, and also that he bought a lease of ten acres in the Burkburnette territory for himself, when he should have bought it for plaintiff to whom he stood in such fiduciary relation that he could not secure it for himself. For the profits of the last transaction a recovery is asked. Neither the complaint nor the evidence gives any excuse for making Jensika Birkeland a party, and we shall refer to the defendant herein as being only Mr. Birkeland.

The learned trial court found in substance these facts:

Plaintiff was incorporated under the laws of Texas, and in 1917 acquired a 20-year lease of 21 acres, called the DuBois tract, near Humble, Texas, for $30,000, paying $3,000 in cash and executing a mortgage thereon to secure the balance of $27,000. The lease contained provisions calling for drilling and operating of at least 10 oil wells, and in case of failure for 30 days to so operate the lessor could cancel the lease. The lessor was to receive one-eighth of the oil produced and one-half of the balance should go to the mortgagee to be applied on the debt. Plaintiff also owned leases of adjoining tracts, but no producing wells are thereon so they do not serve as the bases of any claim against defendant. On January 29, 1917, defendant bought 40 shares of plaintiff's stock and 20 more in May

following, and in the same month his wife bought 40 shares, which shares are still owned by them. The price paid for all was $5,000.

Prior to October 22, 1918, one C. D. Mork had been plaintiff's president, treasurer and director. On that date he resigned all three offices and a treasurer was elected. November 30, 1918, at a meeting of the board of directors, when only 3 out of the 7 were present, a motion was carried electing defendant director and president. Defendant never accepted the office of president or director and at no time served or acted as either. At a meeting of the stockholders of the company, called to discuss its financial condition, defendant stated he would accept the presidency on condition that $30,000 were raised to put it upon a paying basis, and an audit of its books would prove it to be in good shape. Efforts were made to raise this amount, but only a small part thereof was secured, and the conditions upon which defendant had agreed to become an officer of the plaintiff never were fulfilled.

On October 17, 1918, defendant lent plaintiff $5,000, receiving its promissory note indorsed by some of the directors, and on January 27, 1919, in order to enable plaintiff to borrow $3,000 from a bank, defendant indorsed and guaranteed its note in that amount, which note he was compelled to pay September 19, 1919. Defendant has been paid nothing either upon the $5,000 loan or the $3,000 paid on the guaranteed note.

Plaintiff defaulted on the $27,000 mortgage and foreclosure proceedings were instituted by the mortgagee under which a sale was held on September 2, 1919, at which defendant bid in the property covered by the lease in his own name and for himself, paying therefor $18,239.06, and also paying labor claims and expenses, so that the total sum paid amounted to $21,191. The trustee authorized to make the sale executed to defendant a deed conveying to defendant all the right, title and interest of plaintiff in and to the property. From that time defendant has been in possession of the 21 acres as lessee and has operated under the terms of the lease, expending in operating and developing the same to December 1, 1921, the sum approximately of $48,415.96. After such purchase defendant of-

fered to convey said property to plaintiff upon being reimbursed for his investment therein and the amount loaned and paid out for plaintiff, but the corporation has at no time offered to pay defendant any amount whatever for a conveyance thereof.

On February 6, 1919, defendant bought for $15,000 a lease of a ten-acre tract in Wichita county, Texas, in the so-called "Burkburnette Field." This was bought with his own money, and in his own name and for his own use. Plaintiff at no time furnished defendant with any money with which to buy said tract or any other tract, or to invest in oil leases, and defendant at no time had in his possession or control any money of plaintiff for that purpose, nor has plaintiff ever given defendant any authority to purchase said lease or any other property, nor has defendant ever agreed to do so, and plaintiff never had and has not now any right, title or interest in or to the lease purchased as aforesaid on February 6, 1919.

The findings, as above set out in substance, if sustained by the evidence, must result in the conclusions of law which were made. The balance of the findings as to the dissolution of plaintiff by the judgment of the Texas court cannot add to or detract from defendant's right to a favorable judgment. And again, if the findings as above indicated are supported, the many findings asked by plaintiff contradicting the ones made are either contrary to the evidence, or such as not compelled thereby. The greater number of the findings requested and denied are of no special significance, even if true, in view of the controlling findings stated. This same observation holds true in respect to numerous assignments of error upon the exclusion or admission of testimony. We therefore do not propose to notice any rulings which do not touch testimony bearing upon the findings we have herein indicated as controlling. It may also be stated, that the oft-cited references to testimony and documents in another case in this court will not be searched for, since the same are not a part of the settled case certified to by the judge who tried this case. Brokl v. Brokl, 133 Minn. 334, 158 N. W. 436, is not authority for the proposition that we should do so.

A long discussion of the evidence is not necessary for a decision.

The facts found as above stated, with slight additions from the record, will suffice.

It appears that defendant was not interested in plaintiff when it was organized and acquired its oil leases near Humble, Texas. However, with the amount paid for the stock and the money loaned plaintiff and paid out on the loan he guaranteed, made defendant's investment $13,000 in the latter part of 1918. When the directors sought to elect him president, he had announced that he would not accept unless $30,000 was first raised to carry on the work on the DuBois lease, and an audit of the books showed the company in satisfactory shape. In anticipation of the conditions being fulfilled defendant rendered all the assistance he could to help the officers to comply with the conditions. It appears that he made two trips to the property of plaintiff, investigated the workings thereon, and advised with H. J. Peterson, the general manager and a director of plaintiff on the works. This was all done at his own expense, and without expectation of pay from plaintiff.

We shall assume that so long as defendant thus acted, although gratuitously in anticipation of becoming an officer, he stood in a fiduciary relation to plaintiff in respect to its property and lease near Humble. But it is perfectly clear that the conditions upon which defendant had agreed to accept the office of president and director of plaintiff were never fulfilled, and that defendant in March, 1919, long before the foreclosure sale of Sept. 2, 1919, had formally notified plaintiff that he would not accept the positions. No one can be forced to take or retain an office in a corporation. Defendant cannot, therefore, be held a fiduciary to plaintiff by virtue of any official position at the time of the sale. And the record is absolutely barren of any action on the part of the board of directors or executive officers of plaintiff in the nature of any agreement with defendant under which he bid in the property at the foreclosure sale for plaintiff. Plaintiff and its directors and officers knew of the sale. Nothing whatever was said or done by defendant to prevent them or anyone else to attend and bid thereat. It is, therefore, plainly evident that there is absolutely nothing to charge defendant

as a fiduciary when he bid in the property in his own name and paid over $21,000 of his own money for it.

The fact that he immediately afterwards offered that plaintiff take over the property upon being reimbursed ought not to charge him as a fiduciary. No attempt was ever made to accept the offer and it was finally withdrawn. This record produces the conviction that this lawsuit was never conceived as springing from defendant's becoming the purchaser at the foreclosure sale. It is only to give respectability to the claim to the lease defendant bought in the Burkburnette territory that his title to the property near Humble is assailed.

While it remained undertermined whether or not the conditions defendant had made to his accepting the presidency of plaintiff could be met, territory in Oklahoma and the northern part of Texas, in Wichita county, came into prominence as containing good oil prospects. Speculation in leases and the sinking of oil wells therein became rife. In January, 1919, a new well which H. J. Peterson had been sinking upon plaintiff's DuBois lease struck oil in an unexpected abundance, and Peterson sent this telegram to defendant at Minneapolis, dated January 20, 1919:

"Several hours test today shows new well averaging one gallon pure oil per minute would like committee to come to place future activity wire if coming and when also arrange if coming to go to Wichita Falls and Burkburnette Field others making oodles of money why not ourselves also."

This telegram was shown to two or three of plaintiff's directors. Preceding the telegram Peterson, on January 10, wrote defendant a long letter giving in detail how the plant near Humble was being conducted, the difficulties with labor, and excuses for not having complied with defendant's requests to furnish financial reports so that the audit of plaintiff's books could be finished. In that letter are also the following:

"Things are getting quiet in this field on account of a lot of excitement in some new fields, which have come in lately, more than

30 drilling rigs have gone from here to Burk-Burnette in North Texas, where one of the finest fields in the country has opened up the past few months. They are getting 200 to 2,000 bbl. wells at least 1,700 feet deep, and the city of Burk-Burnette has 2 wells to every block or at least will have, when they can get the rigs to drill them. The government had to restrict them to 2 wells to a square block, on account of the material, as everybody with a lot was forming an oil company, but now they pool their interest, and get the same results, with less expenditure. I enclose a picture of the city, showing the derricks in between the buildings, and this was taken sometime ago I am told.

"Several contractors have gone from here up there and they are all crazy about the opportunities up there, and all of them making money almost by the bushel, getting $5.00 per foot for drilling wells 1,650 to 1,700 feet deep, where a year ago, $2.00 per foot would have been considered a good price, all on account of not being enough rigs to do the work there is to be done, and I am told on what is my opinion reliable information, that there has hardly been a dry hole, unless it was drilled by young and inexperienced drillers, who did not know oil sand from water sand. At any rate, it is a wonderful field, and is now several miles long, by several wide, and the geologists claim, it will eventually join with the Ranger field, which is 60 miles away.

"If you were coming down for the yearly meeting, you could stop at Ft. Worth and run over and look at it. I am sure there is some openings where some quick money could be made, I could have had 110 acres last year in what is now some of the best of it, and wrote Mork about it, but was told we had all we could handle. With the bal. from last month, and the $176.00 deposited the other day, the deposit slip of which I sent you, I have met the payroll and some other bills, but have still $33.35 to pay for strainers for the last two wells, $91.00 for shop bill to William Iron Works, $57.00 to Oil Well Supply Co. for a new Eccentric for the power etc., so shall need some money at once both for the above and for payroll. Have everything needed for the well now being drilled except about 10 ft of strainer. Have 30 ft. on hand."

Other testimony shows that the reported speculation in oil leases several hundred miles north of Humble excited Peterson and, no doubt, defendant and the directors and stockholders of plaintiff who were informed thereof. Defendant went to Humble, principally he says, to see the new well. Two other letters were written by Peterson to defendant on January 22 and 23, 1919, on the same subject, but defendant asserts that he had left for Texas before the letters reached him. On his arriving at Humble some days were spent on plaintiff's property, then defendant and Peterson started north, the latter evidently bent upon helping Simpson unload on defendant a tract near Gotebo, Oklahoma, which had been exploited as oil property. However, defendant, learning that by holding off two or three days he could get the tract for $14,000 instead of $50,000, Simpson's price, got wary of the scheme. But the speculative spirit had gripped him and he invested a large sum in a lease on another tract there. This venture must have been unproductive, for plaintiff makes no effort to avail itself of that bargain.

The two then went to Burkburnette and there, on February 6, 1919, defendant obtained the lease to the 10-acre tract here involved. The lessor owned a 160 or 180 acre farm out of which these ten acres were leased. It was some distance from Burkburnette, but the whole surrounding territory seemed to have been used for oil speculation. When this lease was obtained no producing oil well was nearer to it than five miles. Immediately after defendant invested, prices went down so that leases could have been procured in that vicinity for about one-third of what defendant paid. This depression in prices continued until the latter part of April when oil, in promising quantities was struck in a well within a mile of this lease. Defendant returned to Minneapolis in the first part of March and reported to the directors and others about conditions at Humble and of his investment at Burkburnette. He had only been asked by individual directors to report, but when one of these directors was informed of defendant's personal investment he found fault, whereupon defendant proposed that plaintiff take the lease off his hands, paying what it cost him, and he would take the money and

go down there and invest on better terms. No move was made to accept the offer. Not only that, but on March 20, 1919, Peterson telegraphed the same directors to whom defendant made the offer as follows:

"Returned north Texas last night your message recd and happy to know contents have several fine opportunities up north one is four hundred acres held by geologists from Nebraska, who will give half interest for drilling some well both shallow and deep stuff these tracts several tracts in proven territory on fifty-fifty contracts subscribe funds and come to Wichita Falls will be there a few days drilling in well ten days letter follows."

This was no doubt in reply to their telegram reading: "We have confidence that you remain loyal to our company; but we have not heard from you of late. Send report of accomplishments by you and Birkeland when up north in the interest of our company. We instructed Birkeland to inform you that we were ready to raise any amount necessary for acquiring interests in new prospective fields." There is no evidence that Birkeland was ever instructed by anyone before going to Burkburnette to acquire anything for plaintiff. Nor was he so instructed after he informed the same directors of his lease, and at no time did they or anyone else in behalf of plaintiff raise or attempt to raise a single dollar to venture into any leases in the Burkburnette territory. Not until about a year later when defendant's speculation had proved profitable was any move made to assert title to the property. And that did not take the form of offering to pay what defendant had paid for it. Instead, one of plaintiff's present attorneys began to secure proxies from shareholders, held various meetings preliminary to obtaining an assignment of the alleged cause of action and to bringing this suit thereon in the name of plaintiff.

We may assume, but only for the purposes of this phase of the case, that defendant in February, 1919, stood in a fiduciary relation to plaintiff, not only with respect to the lease and property at Humble, but also in respect to any property that he had been

authorized to deal with for plaintiff. Even so, it would not make him a fiduciary of plaintiff as to this lease. As already indicated, he was not directed to go there by or for the company. There is no foundation for claiming that he was authorized to negotiate any lease for plaintiff in the territory, or to speculate in its behalf. Can he possibly hold the plaintiff or any of the directors for the loss sustained in taking the lease at Gotebo? Or, had no oil been found on this 10-acre lease, is there a shadow of a claim upon which defendant could have hoped for reimbursement from plaintiff or any director or shareholder? It is too plain for argument that defendant's investments were at his own risk. The situation would have been different had he been sent by plaintiff to Burkburnette with direction to procure this lease or even to procure for it some lease there. Had he undertaken such a mission, no matter whether he was an officer or not, it would have precluded his buying for himself and this, perhaps, even though plaintiff had not provided him means.

It is not enough that a confidential or fiduciary relation exists between two parties but there must be involved some specific fund or property to which the one owes the other some duty. Thus if one is directed to buy a certain piece of property for another, the fiduciary relation exists between the two as to that property, but as to other properties he is free to deal at his own expense and for his own use. Defendant was not authorized to secure as much as an option in the Burkburnette territory for plaintiff. Buying leases therein was in February, 1919, more of a gamble than anything else. Peterson, who made the strongest witness for plaintiff, admits that defendant's buying of this lease was a wild cat speculation. Peterson, a director of plaintiff with defendant on the ground, did not have the nerve to advise defendant to speculate in oil leases in behalf of plaintiff or at all. The court was clearly right in concluding that no fiduciary relation could be established between plaintiff and defendant with respect to this lease, but that defendant bought it for himself and is entitled to hold it as his own.

Plaintiff cites Steinbeck v. Bon Homme Mining Co. 152 F. 333, 81 C. C. A. 441, but we fail to see the application to the instant

case, for even there the manager was held to have acquired a good tax title to the corporation's property. No fiduciary relation was found to exist in Howe v. Howe & Owen Ball Bearing Co. 154 F. 820, 83 C. C. A. 536, also cited by plaintiff. In Kent v. Dean, 128 Ala. 600, 30 South. 543, a specific ten-acre tract was involved as to which the parties had made a certain oral agreement under which Kent acquired the legal title for Dean. Dick v. Albers, 243 Ill. 231, 90 N. E. 683, 134 Am. St. 369, is against plaintiff, if at all applicable. Tarbox v. Tarbox, 111 Me. 374, 89 Atl. 194, relates to a trust fund in fact, which the defendant had taken possession of and invested under a mutual mistake as to the rights of the parties in the same. A constructive trust was held to have been created. In the instant case there is no thread by which to tie plaintiff's right to this lease, and therefore no basis upon which equity could work a constructive trust in its favor.

Seacoast R. Co. v. Wood, 65 N. J. Eq. 530, 56 Atl. 337, involved the acquisition in his own name by the defendant, the promoter of a railway company, of certain lots needed for a terminal of the railroad constructed. There was evidence that he actually bought the lots for the railroad and even if there had not been, undoubtedly, as chief promoter he could not acquire for his own that which was actually needed to carry out the enterprise.

The trial court is taken to task for ruling at the trial that the matter of accounting should be deferred until it was first determined whether plaintiff was entitled to the property bought at the foreclosure sale, and then finding that defendant had spent approximately $48,000 in operating under the DuBoise lease until December 1, 1921. Plainly this finding was not intended to conclude the parties, but merely to show that, in view of the large expenditures involved in keeping the lease alive, plaintiff should have acted promptly if any rights were to be secured under defendant's offer made after the sale to take the property off his hands, and that after this long delay it would be inequitable to grant any relief or decree an accounting.

Defendant was permitted over plaintiff's objection to call Rorem for cross-examination under the statute. He was the secretary and

a director of plaintiff when the Burkburnette lease was taken and the foreclosure was made. Assuming, but not deciding, that he had been legally removed before the trial, it was error to allow him to be called for cross-examination. Snelling State Bank v. Clasen, 132 Minn. 404, 157 N. W. 643, 6 A. L. R. 1663. But as there said: "It does not follow that contrary, rulings furnish a ground for reversal." See also Leystrom v. City of Ada, 110 Minn. 340, 125 N. W. 507. We find nothing in either Rorem's attitude or testimony prejudicial to plaintiff or of any particular advantage to defendant upon the controlling issues.

No error was committed in excluding oral testimony of the contents of an alleged letter from defendant to Torvie, plaintiff's treasurer. The latter's deposition was taken, but no inquiry was then made for this letter. It was well within judicial discretion to hold that sufficient foundation had not been laid for the introduction of secondary evidence of its contents.

Since we hold the findings of the learned trial court amply sustained to the effect that defendant acquired both the Burkburnette lease and the DuBois lease when not standing in any fiduciary relation to plaintiff as to either property, there can be no relief granted plaintiff, and it is wholly unnecessary to consider the effect of the judgment of dissolution of plaintiff or the validity of the meetings of shareholders and directors occurring subsequent to 1919.

The judgment is right and is affirmed.