THE SEACOAST RAILROAD COMPANY and THE ATLANTIC CITY RAILROAD COMPANY

*v.*

R. FRANCIS WOOD et al.

[Filed November 28th, 1903.]

1. Where options on property were procured by a director and promoter of a railroad prior to the date on which he resigned and became a contractor for the building of the road, the railroad corporation, on its organization, had, by virtue of its power to ratify his contracts, an equitable interest in the property, so that when he took the deeds he took title for the use of the railroad.

2. Where a contractor, in purchasing land for building a railroad, bought certain lots for terminal purposes in the same manner that he purchased the right of way and built the road, as projected, so as to embrace and enter the terminal, which thus became an essential part of the road, he was precluded from asserting that the terminal properties did not become part of the road and from setting up a personal right therein.

3. A decree in a suit involving the validity of bonds issued as compensation to a contractor for the building of a railroad, to which such contractor was a defendant, which disallowed a number of the bonds as

being in excess of what he was entitled to, and validated others on the ground that they had come into the hands of *bona fide* purchasers, imposed on such contractor the burden of showing that the bonds and stock which he actually received did not entirely pay him for certain property bought by him for the railroad.

4. The equity of a railroad to hold property which a contractor, who was building the road, and who had actually received bonds as compensation, purchased for railroad terminals, taking title in his own name, was superior to the equity of a trust whose funds the contractor used in part in making the purchase.

5. The fact that the trustee obtained a deed voluntarily given it by the contractor, did not improve such trustee's position, where no part of the trust debt was canceled, or any security delivered, or the trustee's position in any way changed.

This bill is filed to obtain a decree that R. Francis Wood holds the legal title to two lots of land in Cape May City, now occupied by the complainant for terminal use, in trust for the Seacoast Railroad Company; and also to obtain an injunction against the further prosecution of an action in ejectment brought by said Wood to dispossess the Atlantic City Railroad Company.

The gravaman of the bill is that these two lots were bought by Edward R. Wood as agent of the Philadelphia and Seashore Railroad Company; that Wood took the title to the lots in his own name, and that the present holders of the legal title to the lots, and mortgagee, are not purchasers for valuable consideration.

The Atlantic City Railroad Company are lessees of the Seacoast Railroad Company and successors to the rights of the Philadelphia and Seashore Railroad Company.

The history of the transaction, of which the present litigation is the sequence, is as follows: In 1889 a project was conceived of building a railroad, which, by connecting with the Camden and Atlantic railroad at Winslow Junction, would connect Philadelphia with Cape May City. Mr. Edward R. Wood appears to have been the leading mind in conceiving this enterprise. Before the organization of any company, but after a number of gentlemen had been persuaded to join Mr. Wood in the railroad enterprise, Mr. Wood took measures to secure options for rights of way for the projected road. Instead of having a

single corporation for a road running from Winslow Junction to Cape May City, two corporations were organized, at different dates, obviously for the purpose of avoiding the necessity of paying the full amount of $2,000 per mile required by the laws of this state upon filing a certificate for a railroad corporation. Both certificates for these two roads were executed in August, 1889, the first on August 6th and the second August 8th. The certificate for the first company was filed on November 18th, 1889, under the name of the Philadelphia and Seashore Railroad Company, which ran from Winslow Junction to Sea Isle City. The second certificate of incorporation for a road, which was to run from Sea Isle City to Cape May City, was not filed until February 4th, 1890. Whatever the purpose in filing two certificates instead of one was, it appears conclusively that those concerned in the venture regarded and treated the two certificates as designed to effect a single purpose and proceeded to build the road upon that theory. As already remarked, before the first certificate was filed, Mr. Wood began to secure options from landowners for rights of way, not alone between Winslow Junction and Tuckahoe, but also between the latter place and Cape May City. As it was of the utmost importance that property for a terminal in Cape May City should be secured, Mr. James E. Taylor, who was afterwards secretary of the roads, at the instance of Mr. Wood, negotiated for options for the two lots now in question in Cape May City. Mr. Taylor says that he got options for these two lots in the name of the Philadelphia and Seashore Railroad Company. One of these lots belonged to a Mrs. Schellinger and the other to Doctor Mecrey. Whether these options were taken in the name of Mr. Wood or in the name of the Philadelphia and Seashore Railroad Company is not a matter of importance. The purpose of obtaining these options, and subsequently the deeds for the lots, is manifested by the correspondence between Mr. Wood and Mr. Taylor.

On October 5th, 1890—the date of the incorporation of the first road being November 18th—Mr. Wood wrote to Mr. Taylor concerning the Mecrey, Schellinger and other properties. He says :

Seacoast Railroad Co. et al. *v.* Wood.

"I feel as if $30,000 was about the limit that the company can afford to pay for its terminal real estate at Cape May, and including the Town properties and the Wales field in the rear, it will take careful management to secure them at that figure. The Wales property, and Mrs. Schellinger are the trying points, and an option should be secured fixing the price of those two at least. Probably you may know some one who can act for you to more advantage, as you are known to be connected with the new railroad company. I will send you $100 for option money."

On August 9th Mr. Wood wrote to Mr. Taylor:

"I inclose you a check for $120 so that you can draw the notes and hand a part of the amount to L. M. Hall to secure the Schellinger property on sixty days option at once. Unless you have some immediate use for the twenty dollars balance, you can put it in the New Jersey Trust and Safe Deposit Company to this company's credit. I shall keep a small account there."

These letters were written on the letter-head of the Philadelphia and Seashore Railroad Company, of which company Mr. Wood was then treasurer.

On October 12th Mr. Wood wrote to Mr. Taylor:

"I write to acknowledge receipt of option papers for the Delaware House (this was the Mecrey property) covering one hundred dollars of remittance made and what disposition shall be made of the twenty dollars remaining. * * * One or two acres and the right of way is all that will be needed for railroad purposes. It might be better simply to get a price upon a certain piece of it, say about two acres for some purpose. It is desirable to get these properties arranged for as soon as possible, because no one never knows how soon a thing of this sort may leak out, and in that case we had better get our business with councils started as soon as possible."

On November 20th, Edward R. Wood resigned as director and treasurer of the Philadelphia and Seashore Railroad Company, and on November 27th, 1889, there was an agreement entered into between that road and Mr. Wood, by the terms of which agreement Mr. Wood agreed to build the line of railroad from Winslow Junction to Sea Isle City.

This agreement is displayed at length in the opinion of Vice-Chancellor Bird in the case of *Wood* v. *Boney, 21 Atl. Rep. 574,* and again in the opinion of Vice-Chancellor Pitney, de-

livered in the case of *Baker* v. *Guarantee Trust and Safe Deposit Co., 31 Atl. Rep. 174.*

It is sufficient, for the present purposes, to point out that the agreement provides that the railroad company would assist in organizing a railroad from Sea Isle City to Cape May City. The railroad company agreed that any contract it might make for building this Cape May road should be given to Mr. Wood upon the same general terms as contained in the contract of the one then executed. The price to be paid to Wood for building the road to Sea Isle City was $550,000 worth of first mortgage bonds and the same amount of stock, and he was to be paid for building the road from Sea Isle City to Cape May $350,000 worth of stock of the contracting company and the same amount of first mortgage bonds.

The eighth item of the agreement provided that the costs of securing the rights of way should be borne by Wood; and the third section provided that Wood should erect suitable stations.

After the execution of the agreement Wood proceeded in the acquisition of the title to lots for rights of way, and his purpose was evidenced by letters written on November 27th, December 5th, 12th, 18th and 19th, 1889, and January 6th, 1890, and February 20th, March 1st and March 9th, 1890.

On January 11th, 1900, Mr. Wood took a deed from James Mecrey for the Mecrey lot, and on January 17th, 1900, from William S. Schellinger for the Schellinger lot. Both deeds were made to Edward R. Wood. The articles of association for the incorporation of the Cape May and Tuckahoe Railroad Company, running from Sea Isle City to Cape May, had not yet been filed.

Mr. Wood, on August 1st of the same year, conveyed these lots to one Burleigh, obviously to enable Burleigh to mortgage the property, which Burleigh did, by making a mortgage to Wood, trustee, conditioned for the payment of $8,500 in five years. Wood, at the same time, executed a declaration of trust in which he declared that he held the said property for the estate of Mary and Julianna Wood, of which estate he, with George and Redmond Wood, were trustees. Wood had taken the money

belonging to this estate for the purpose of paying the cash amount of the consideration for these two properties.

Burleigh, on August 2d, conveyed the equity of redemption in these properties to Wood, and then Wood conveyed them to R. Francis Wood, the present defendant in this suit. The conveyance was made to R. Francis Wood for the purpose of securing the estate for the money which had been used to pay, in part, for the properties.

Assuming that these properties were bought for the Philadelphia and Seashore Railroad Company, the way in which the complainants are interested in the lots is this: The property and franchises of both roads, namely, the Philadelphia and Seashore Railroad Company and the Cape May and Tuckahoe Railroad Company, were judicially declared insolvent; a receiver was appointed for each; these receivers sold the property and franchises of each company to the South Jersey Railroad Company. This company in turn became insolvent and, in the course of the proceedings taken, its receiver sold its property and franchises to the Seacoast Railroad Company. The Seacoast Railroad Company, on May 2d, 1898, leased all its property to the Atlantic City Railroad Company for the term of nine hundred and ninety-nine years.

*Mr. Eugene C. Cole* and *Mr. Robert H. McCarter,* for the complainant.

*Mr. Joseph H. Gaskill* and *Mr. Samuel H. Grey,* for the defendants.

Reed, V. C.

The testimony exhibits Mr. Edward Wood in his relations to these railroads as promotor, director and contractor. All that he did previous to the incorporation of the first road clearly appears to have been for the use and benefit of both companies when thereafter organized. Even the scheme for executing a contract by which Mr. Wood was to build the road seems to have been conceived before the filing of the certificates of incor-

poration. The board of directors, in the earlier part of the transaction, appear to have been puppets whose movements were directed by Mr. Wood. No intelligent and independent board would have entered into such a contract for the construction of any road with an independent contractor. Nothing, apart from what Mr. Wood was to receive, is defined with any particularity, except the weight and size of the rails and the general grade of the road. The number, size and location of the stations and the amount of rolling stock in excess of six engines, thirty passenger and thirty freight cars, are left to the discretion of the contractor. The purport of the contract was, "you go on and build a railroad and you shall have so many bonds and so much stock." After the execution of the agreement of November 27th, Mr. Wood began to build a road. On December 6th the company executed a mortgage to the Guarantee and Safe Deposit Company to secure the payment of the nine hundred bonds at $1,000 each, which were to be delivered to Mr. Wood for the execution of his contract. This mortgage covered the then incorporated road and all its branch lines then in course of construction and thereafter to be constructed. On February 4th the certificate of the Tuckahoe and Cape May road was filed. It was signed by twelve of the sixteen persons who had signed the former certificate. On December 16th Mr. Wood made a sub-contract with a Mr. Tennis to build the Tuckahoe branch. This agreement was made between Tennis, of the first part, and the Philadelphia and Seashore Railroad Company, by their contractor-in-chief, Mr. Wood, party of the second part. In August, 1890, the board of directors became dissatisfied with the delay in the work of construction and with other matters, and on September 2d passed a resolution rescinding the construction contract of November 27th.

On October 25th, Mr. Wood filed a bill in this court to compel the directors to specifically perform the contract and to cancel the resolution of the board rescinding it. Upon final hearing this bill was dismissed. The company itself then proceeded to complete the construction of the road.

In 1891, July 20th, the Philadelphia and Seashore Railroad Company was declared insolvent, and a receiver was appointed.

In the same year, Mr. Philip P. Baker, receiver, having sold the property of the company, filed a bill attacking the trust mort-gage made to secure the bonds, and attacking, also, the validity of the bonds issued.  This suit became, in substance, one for the adjustment of the various claims against the road which had been presented to the receiver.  The opinion of Vice-Chancellor Pitney in this case contains an exhaustive and lucid exposition of the transaction of the company, and of Wood with the company.  It exhibits the fact that four hundred and sixty-five bonds had been issued to Mr. Wood, which issue was in excess of the value of so much of the work done and materials furnished as Mr. Wood had paid for in money or in bonds up to the time when the company intervened and itself took charge of the further construction.

The consideration paid for the two tracts of land now in question was paid by Mr. Wood, in part, by the delivery of bonds so issued to him, and in part by money belonging to a trust estate of which he was trustee.

The question, it is perceived, is whether the complainants, as successors in title of the Philadelphia and Seashore railroad and the Tuckahoe and Cape May railroad, have an equitable interest in these two lots, which this court will protect against the claim of the holder of the legal title.  The defendants deny the existence of any equitable right in the complainants.

In doing so, the defendants assume that the complainants must rest their claim on the existence of a resulting trust raised by the payment of the property of the company in the purchase of these lots.

The presumption of a trust, however, can rest upon other grounds than the one mentioned.  That Mr. Wood, when the options were taken for these lots, was acting as the agent of the prospective railroad company, is too clear for serious discussion.  I am aware that the company, when it came into existence, was not bound by any contract theretofore made by Mr. Wood.  The obligations of a corporation for the contracts of a promoter must rest upon a ratification by the company.

But Mr. Wood's position was such that the corporation, after

it came into legal existence, could ratify his contract and assume the benefit of its provisions, and, of course, incur the obligation incident to it. Now the company, and its successors, have always treated and used these lots as a part of its property, and so became entitled to the benefit of Wood's contract and liable to the obligations which he incurred in its purchase. The rule is entirely settled that an agent or trustee who, in his own name, makes a purchase while in the performance of his duties as such, holds the property for the benefit of his principal or *cestui que trust. Van Hurter v. Spengeman*, 2 *C. E. Gr. 185*.

Where the agency is contractual, the statute of frauds requires that the agency be proved by written testimony, for, as the trust springs out of the relation of principal and agent, the relation arises from the agreement between the parties. This agreement, therefore, is within the statute and must be in writing. *Perry Trusts* § *135; Sugd. Vend. & P.* § *912*.

The letters written by Mr. Wood to Mr. Taylor contain the written evidence of his agency.

It is also settled that if a person standing in a fiduciary relation buys property so connected with a trust property that it must be used with a trust estate, and an independent ownership would seriously affect the use and value of the trust property, he cannot retain the same to his own benefit. *Perry Trusts* § *129*.

But Mr. Wood claims that while he bought these properties intending them to be used as terminals of a prospective railroad, yet he only intended to devote them to the use of the railroad in case the railroad paid him for them. His position, in substance, is that from the beginning he expected to have the contract for building the road; that he procured all these options with a view of using the property in executing his contract to construct a railroad; that he was prevented from finishing the road; that he was not paid in full for what he had done, and this property is included in the unpaid portion of the material furnished for the road.

Whatever was in the mind of Mr. Wood at the time he took the original options, it is quite clear that up to November 27th,

when he changed his position from agent or director to contractor, his relations with the prospective railroad were fiduciary.

Now, it is to be observed that the option for the Delaware House (the Mccray property) seems to have been signed previous to November 27th, for on October 12th, 1889, when he became contractor, Mr. Wood wrote to Mr. Taylor acknowledging the receipt of the option-papers for the Delaware House. The inference, also, seems almost conclusive that the option for the Schellinger property was also procured before November 27th, for on October 9th Mr. Wood writes to Mr. Taylor about securing the Schellinger property on sixty days' option at once. On December 5th, he writes: "Instead of offering Mrs. Schellinger $500 for a renewal, I would propose to take the property just as soon as they can get the searches and show a clean title." It follows, therefore, that when the corporation was formed an equitable title in these properties attached to it. The power to ratify these contracts invested the company with an interest in the property, and this interest existed when Wood became contractor.

This interest was never released, nor were the contracts rescinded. When Wood took the deeds this interest existed, and he took the title for the use of the railroad company. By force of the agreement he became liable to pay for this land, but the use to which the land was to be put was fixed.

But, aside from this view, it seems to me that the acts of Mr. Wood, while contractor, precluded him from successfully asserting that this land did not become a part of the railroad. It is certain that the road was to be built a completed entity. Mr. Wood expresses this idea in his testimony, when he says "it [this property] was purchased by him [Taylor] for my account, in expectation that it was to be put in the mass of material that I was using to build the railroad with." Before the contract was executed, he recognized that suitable terminal facilities at Cape May City was of the first importance. Indeed, the success of the enterprise depended upon such facilities at that place, and upon the success of the enterprise depended the value of the bonds and stocks which he was to receive in

payment under the construction contract. That these lots were purchased for; and that they were the only property purchased for such terminal purposes, is apparent from his letters to Mr. Taylor after he became contractor.

These terminal lots were therefore bought just as the rights of way along the whole route were bought. Over much of these rights of way the road had been graded, tracks laid and bridges built. The railroad projected, and finally built as an entirety, ran into and included the Cape May terminal.

In this situation, it seems to me that even if it be true that Mr. Wood had not been paid for all the work done, and for all the property purchased for the company, he would not be permitted to strip this company of this essential part of its plant. Whether the court should impose conditions that the company should pay to the defendant any unpaid portion of the amount which the property cost Mr. Wood, is aside from the question whether a trust exists. It seems quite clear that either with or without conditions imposed in respect to such payment, the court will prevent the attempt of the defendants to assert a personal right to the possession of this property.

Assuming the trust to exist, the question remains whether R. Francis Wood should be paid the amount of trust funds which Edward R. Wood used in payment for the property. This depends upon another question, namely, whether the latter gentleman has been already paid by the original company for this property. If he has been so paid, then the company and its successors in title is entitled to hold the property without further compensation.

For the purpose of exhibiting the transactions between Mr. E. R. Wood and the original company, the records of two cases are introduced into this cause. One is the case of *E. R. Wood* v. *Philadelphia and Seashore Railroad Co. et al.,* reported in *21 Atl. Rep. 574.* In this case Mr. Wood filed a bill to cancel the resolution of the board of directors of the railroad, rescinding the construction agreement of November 27th and to obtain other relief. As appears from the opinion delivered in that case by Vice-Chancellor Bird, Mr. Wood's counsel contended

that Mr. Wood was entitled to more stocks and bonds than he had received, and that, in any event, he was entitled to an accounting. The court overruled both insistences. It held that the stock and bonds had been issued to Mr. Wood upon his own estimates of the amount of work done and materials furnished in proportion to the amount of work to be done and materials furnished to complete the road, and also held that the estimates were exceedingly liberal towards Mr. Wood. The vice-chancellor said: "If the testimony of the experts offered by the defence be regarded as of any value, it would appear that Wood had been paid largely in excess of what he is entitled to." The court held, also, that Wood had himself failed to keep his accounts in a manner which made it possible to take an account.

In the answer filed in that suit, it appears that among the estimates for work done, upon the basis of which estimate bonds and stock were issued, there was an item as follows: "Terminals one-quarter of $120,000, thirty thousand dollars." That this estimate was presented by Mr. Wood to the company is nowhere denied.

While the statements in the opinion do not conclude Mr. Wood, yet the dismissal of his bill shows conclusively that he had no equitable ground for the relief he asked.

In the case of *Baker* v. *Guarantee Trust and Safe Deposit Co.,* reported in *31 Atl. Rep. 174, 180,* the court was called to pass upon the validity of the bonds issued to Mr. Wood, and which Mr. Wood had passed away by sale or exchanged for materials used in the construction of the roads. These bonds were presented by their holders to the receiver as claims against the insolvent railroad company. Mr. Wood was an answering defendant in that suit. It was decided that all the bonds, except the first one hundred, were illegally issued to Mr. Wood. But the learned vice-chancellor considered and passed upon the contention of the counsel for certain bondholders, that bonds issued to Mr. Wood equal in par value to the value of the work actually done and materials furnished, should be held valid. The vice-chancellor said: "All that Mr. Wood

could possibly claim credit for in the way contended for was the amount actually paid out and expended in the construction of the road, the object being to ascertain the amount of actual assets to the company at any particular time desired, in order to ascertain whether or not there was at that time an excessive issue of bonds."

It is to be observed that Mr. Wood, by the terms of the construction agreement, had power to pledge the credit of the company in making purchases until $500,000 should be realized upon stock subscriptions. The credit of the company was so pledged for a large portion of the work done and still unpaid for.

The vice-chancellor found that the amount of work done and materials furnished and paid for was $267,810, and that he had received four hundred and sixty-five $1,000 bonds and seven thousand eight hundred and forty shares of stock. The proportion of stock and bonds received bore a much larger proportion to the amount he was entitled to receive for the completed work than the amount of work done and materials furnished and paid for bore to the cost of the completed road.

In alluding to the estimates put in by Mr. Wood, the vice-chancellor said: "For terminal lands, he allows $120,000."

That the amounts paid for these terminals were included in the total amounts expended, is apparent from the observation of the vice-chancellor that above $100,000 had been paid out in bonds in procuring rights of way and terminal facilities for and in the construction of the Tuckahoe and Cape May Railroad Company.

The final decree disallows the claims of a large number of bondholders and validated the claims of other bondholders, upon the ground that they had been taken from Mr. Wood *bona fide* and for valuable consideration. The logical conclusion from the decree was that Mr. Wood had received more bonds than he was entitled to.

Regardless of the opinions of the court in the two cases mentioned, and regarding only the force of the decree, the duty is certainly thrown upon Mr. Wood to show that the large amount of bonds and stock which he admittedly received did

not entirely pay him for this property, and that duty he has not discharged.

Nor do I think that the present legal owner of the property has any right in it higher than that of the complaining company. It is true that of the entire consideration of $14,500 paid by Mr. Wood for these tracts, only $8,000 was paid in bonds, and that the remaining $6,500 was paid in trust funds.

It is also true that, as against Mr. E. R. Wood, Mr. R. Francis Wood would have the right to follow these trust funds into the property purchased. But as against the railroad company, Mr. R. Francis Wood encountered an equity in the property older than his own. There never was a time, from the organization of the company and the issue of the first one hundred bonds (which occurred before Wood took title to the property and paid out the trust money), that Wood does not seem to have been overpaid. When he took title, therefore, he was only buying property for the company, for which he had already been paid. The equity of the railroad company to hold the property was superior to that of the trust company whose money E. R. Wood then paid out.

Nor does the fact that R. Francis Wood holds a legal title by a deed from E. R. Wood, made at Wood's own volition, place the trustee in a better position, for it does not appear that the trustee canceled any part of the trust debt due from E. R. Wood or delivered up any security or changed his position in the least. The deed was made to him simply to secure an antecedent debt, and, therefore, R. Francis Wood was not a purchaser for a valuable consideration.

I shall advise a decree directing R. Francis Wood to make a conveyance of the terminal lots to the Seacoast Railroad Company; canceling the mortgage held by George Wood and Richard T. Wood, trustees; declaring that a judgment obtained by Lee & Wurtz against E. R. Wood is not a lien upon this property, and directing that the injunction against the prosecution of action of ejectment be made permanent.