ALASKA NORTHERN RY. CO. v. ALASKA CENT. RY. CO. et al.

(Third Division. Valdez. November 1, 1915.)

No. 720.

1. TRUSTS ☞365(2)—EQUITY—LACHES.

In this case nearly ten years elapsed before the claim was made that the land was not the rightful property of the Ballaines, and no reason or excuse whatever is offered why the claim was not sooner made. No diligence whatever is shown or any effort made to ascertain the facts, until by reason of the government of the United States taking over said railway property, the town site of Seward acquired a speculative value which it had not had before. *Held*, the plaintiff is barred by laches.

2. RAILROADS ☞61—CAPACITY TO HOLD LANDS—TRUSTS.

In the absence of statutory authority a railroad cannot lawfully take or hold land, other than what it actually requires for depot, terminal, and station grounds, and that a trust in lands similar to the one claimed by plaintiff in this case, although clearly recognized, would not be enforced for that reason.

3. FRAUD ☞50 — EVIDENCE — BURDEN OF PROOF — PRINCIPAL AND AGENT.

Fraud will never be presumed, but must be proved by clear and unambiguous evidence; yet this rule is sometimes modified in cases where one holding a fiduciary relation takes advantage

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of such position to acquire benefits for himself which in equity and good conscience belong to another. In such cases the acts of the agent will be scrutinized closely.

This action was commenced on April 29, 1915, by the plaintiff, the Alaska Northern Railway Company, as successor in interest to the Alaska Central Railway Company, claiming to be the equitable owner of about 159 acres of land, known as the town site of Seward, which it alleges the defendants, John E. Ballaine and Frank L. Ballaine, acquired in their own names, but in trust for the Alaska Central Railway Company.

The bill alleges that prior to the year 1905, defendant John E. Ballaine, being an officer of the Alaska Central Railway Company, procured for himself, but in the name of his brother, Frank L. Ballaine, title to the said land, diverting funds under his control belonging to the said railway company, to pay for the same, to wit, $3,000 to pay for soldier's additional homestead scrip with which to patent said land, and $4,000 with which to secure the relinquishment of Mary Lowell, who at that time occupied and claimed said land as her homestead, in fraud of the rights of said railway company. That said land was patented in two tracts in the name of Frank L. Ballaine, one patent dated May 1, 1905, and the other May 20, 1905.

Defendants John E. and Frank L. Ballaine by their answers deny that said land was acquired by them in any other way than in their own right (John E. owning two-thirds and Frank L. one-third); deny all the claims of the plaintiff; allege that they paid all expenses for patenting said land, including cost of soldier's additional homestead scrip and $4,000 paid Mary Lowell for a release of all her claims to said land out of their own funds. They also set up certain further defenses by way of estoppel, viz.: Laches in bringing said action; that said railway company is not empowered under the law to take or hold any lands, except for the actual and necessary requirements of its railway business; that no right to said lands was ever claimed by the Alaska Central Railway Company, and none transferred by the deed to the plaintiff company; and estoppels by the acts of the railway company, in that deeds conveying certain portions of said land were made to and accepted by said Alaska Central Railway Company, by the Ballaines, and later transferred to the plaintiff, the Alaska Northern Railway Company.

T. C. West, of San Francisco, Cal., and L. L. James, Jr., of Seward, for plaintiff.

James A. Haight, of Seattle, Wash., and L. V. Ray and S. O. Morford, both of Seward, for defendants.

BROWN, District Judge.   It is a matter of grave doubt if one or more of these further defenses or pleas in bar would not be sufficient to defeat the plaintiff's cause of action.

On the question of laches:   In Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807, the court says:

"In this class of cases the plaintiff is held to stringent rules of pleading and evidence, and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made."

In this case nearly ten years elapsed before the claim was made that said land was not the rightful property of the Ballaines, and no reason or excuse whatever is offered why the claim was not sooner made; no diligence whatever is shown or any effort made to ascertain the facts, until by reason of the government of the United States taking over said railway property the town site of Seward acquired a speculative value which it had not had before in years.

On the question of the right of a railway company in Alaska to acquire and hold land, other than what is necessary for its actual needs for railway purposes, the right is at least very doubtful.

There is no statutory authority given for such ownership, even though, as in this case, the articles of incorporation provide for the acquiring of townsites, as they provide for the acquiring of almost every kind of property and engaging in every kind of business known to the ingenuity of man in the preparation of such documents.   The case of Case v. Kelly, 133 U. S. 21, 10 Sup. Ct. 216, 33 L. Ed. 513, seems to be very much in point on this question, and it is there held that in the absence of statutory authority a railroad cannot lawfully take or hold land, other than what it actually requires for depot, terminal, and station grounds, and that a trust similar to the one claimed by plaintiff in this case, although there clearly recognized, would not be enforced for said reason.

There is some doubt as to the defense that no conveyance or transfer was ever made to the Alaska Northern Railway Company, expressly mentioning any right, title, or claim of the Alaska Central Railway Company in or to said town site.

There is also considerable doubt as to the effect of the acceptance of the deeds made by the Ballaines to the Alaska Central Railway Company of certain tracts and lots in said town site.

It is always better and more satisfactory, however, that a case should be determined upon the merits where possible, than to go off upon legal questions which may be open to much disputation. The latter course may be more interesting to lawyers, but not so satisfactory to clients.

A demurrer to plaintiff's complaint was overruled; likewise a motion for nonsuit at the close of plaintiff's testimony. Both plaintiff and defendants have had the fullest opportunity to introduce every bit of evidence bearing upon the question involved, and while it is true that a great mass of evidence, oral and by deposition, by book and document, has been received in evidence, much of it is superfluous. From that evidence it is possible to determine satisfactorily the real truth of this controversy.

There is very little difference between the facts shown by the testimony of the plaintiff and defendants; there is a wide divergence of opinion between plaintiff and defendants as to the inference and conclusions to be drawn from the facts.

It may be said at the outset, however, that the plaintiff has wholly failed to substantiate the allegations of its complaint to the effect that defendant John E. Ballaine or defendant Frank L. Ballaine ever diverted any funds at any time or in any sum whatever from the Alaska Central Railway Company, or the Tanana Construction Company, or ever had the funds of either company under their control. The undisputed testimony in the case shows that they paid all expenses of surveying and patenting the land in controversy, including the cost of soldier's additional homestead scrip (about $2,000), and the $4,000 paid Mary Lowell for her relinquishment, from their own funds.

The Alaska Central Railway Company was incorporated under the laws of the state of Washington, March 30, 1902, largely through the efforts of defendant John E. Ballaine; its object being to survey a route and if possible build a railway

line from the southern coast of Alaska to the interior of the country, reaching the Tanana or Yukon river. The names of the trustees designated in the articles of incorporation were:

G. W. Dickinson, Seattle, Wash.

E. E. Caine, Seattle, Wash.

Charles L. Denny, Seattle, Wash.

J. W. Godwin, Seattle, Wash.

John E. Ballaine, Seattle, Wash.

George Turner, Spokane, Wash.

Charles F. Peck, Omaha, Neb.

John H. McGraw, of the state of Washington.

Neither Charles L. Denny (by reason of ill health) nor Charles F. Peck (for some other reason) ever qualified or served as trustees. Later F. Aug. Heinze and James A. Haight were selected to take the places of the said Denny and Peck.

A limited amount of money was raised, and a survey party was sent to Alaska in 1902, which began surveying near the head of Resurrection Bay. The survey party was under the charge of C. M. Anderson, a civil engineer. Many locations of various kinds, mineral and nonmineral, were made or attempted to be made by this party, along the shores of Resurrection Bay, extending a distance of some 10 or 12 miles along the shores and around the head of said Resurrection Bay.

At that time the land in controversy was occupied and claimed by one Mary Lowell, a Russian woman, who had married an American and was living on said land with her family of children. A few nonmineral locations for railway terminal purposes appear to have been made adjoining the land claimed by Mrs. Lowell. All of these locations, while it does not clearly appear by whom they were made, were presumably made under the authority of the engineer, Anderson; but no location appears to have been legally initiated at that time, or followed up by the acts necessary to divest the title from the United States, except as certain portions thereof may have later been surveyed and acquired as terminal grounds for the Alaska Central Railway Company.

A map introduced by plaintiff (being Exhibit No. 1 of testimony of W. H. Whittlesey) shows that there were five wharf sites designated on said map, at various points around the head of Resurrection Bay.

In the spring and early summer of 1903 the funds of the Alaska Central Railway Company were at a very low ebb. It seems that John E. Ballaine and other members of the board of trustees had made strenuous efforts to raise money to finance said company, but the financial condition of the country was such that it was impossible to raise funds. At this time some of the trustees were ready to give up attempting to finance the company. Mr. Heinze had withdrawn, saying it was impossible to raise the money. John E. Ballaine seemed to be the only one with optimism enough to continue his efforts.

In the month of June or July, 1903, he called to the attention of all the trustees of said Alaska Central Railway Company, except Mr. Heinze, who had ceased to act, and Senator Turner, who was absent from the United States, the fact that land for a town site should be located and title acquired from the United States on Resurrection Bay, from which said railroad was projected.

The undisputed testimony shows that the defendant John E. Ballaine desired the railway company to take up this town site, then claimed by Mary Lowell, as part of the railway property. This the board of trustees declined to do, for two reasons: First. James A. Haight, one of the members of said board of trustees, who was an attorney at law, gave it as his opinion that it was very doubtful if the railway company could hold or acquire title to any lands except such as were actually necessary for the conduct of its business, to wit, depot, station, and terminal grounds. The second reason was that the said trustees felt that the taking up of said land was speculative, and there were no funds with which to pay the expenses thereof. John E. Ballaine then asked if any of the board of trustees cared to go in with him or become interested in the location and patenting of said land for a town site, and, no one of said board of trustees desiring so to do, the said John E. Ballaine then announced that he would take it up himself, individually, and there was no objection made on the part of any of said board of trustees.

On August 1, 1903, John E. Ballaine sent his brother, Frank L. Ballaine, to Seward, Alaska, where he arrived about August 12th and immediately procured relinquishment from Mary Lowell to her homestead covering the land in controversy. Frank L. Ballaine then caused a survey to be made of the land

and left for Sitka and Juneau, where he made application in the surveyor general's office and the United States land office for official survey and patent for said land under soldier's additional homestead scrip, which John E. Ballaine on July 20, 1903, had procured from John M. Rankin, of Washington, D. C., paying him $2,000 therefor out of his own funds.

On August 11, 1903, the Tanana Construction Company was organized under the laws of the state of Washington by Robert B. Evans, John Dowdle, A. W. Swanitz, John E. Ballaine, and James A. Haight for the purpose of taking a contract from the Alaska Central Railway Company to build its railroad.

About August 20th John E. Ballaine, accompanied by Col. A. W. Swanitz, John Dowdle, Robert B. Evans, and others, left Seattle for Resurrection Bay. They met Frank L. Ballaine at Juneau, and he told his brother, John E., what he had done with regard to getting the relinquishment of Mary Lowell for said homestead. The said party arrived at Resurrection Bay on August 28th. On September 2, 1903, John E. Ballaine gave to said Mary Lowell a note for $4,000, payable nine months after date, without interest, signed by the Seward Town Site Company, by John E. Ballaine, President.

Both John E. Ballaine and Frank L. Ballaine testified that at that time they were copartners in said town site and expected to carry it on under the name of the Seward Town Site Company.

Said Dowdle became dissatisfied with the situation, and he, together with John E. Ballaine and Colonel Swanitz, left Seward about the 10th of September for Seattle.

The financial affairs of the company were again at a low ebb, when Colonel Swanitz succeeded in enlisting the aid of the Shedd Bros. of Chicago, who undertook to finance the railway company.

In the spring of 1904 Colonel Swanitz, as chief engineer, came out to Seward, together with one Elbridge R. Keeler, who was the treasurer of said Tanana Construction Company, and directly responsible to the Shedd Bros. He paid out all of the moneys for the railroad work being done by the Tanana Construction Company and on June 2, 1904, the said Lowell note for $4,000 was presented to him, and he was asked to pay the same. At that time John E. Ballaine was absent from Alaska, and there was no bank in Seward, and no cable or telegraph line running into Seward. Frank L. Bal-

laine at this time was also absent from Seward. Mr. Keeler told the holders of said Lowell note that said note must be paid by John E. Ballaine; that neither the Alaska Central Railway Company nor the Tanana Construction Company had anything to do with it. The one who presented the note, being some relative of Mrs. Lowell, was very insistent that the note be paid. Mr. Keeler then told him that he would have to wait until Colonel Swanitz, who was the chief engineer and practically in charge of the enterprise in Alaska, returned to Seward. A few days thereafter Colonel Swanitz returned, and Mr. Keeler took the matter up with him. Colonel Swanitz, a witness for plaintiff, testified that, inasmuch as Frank L. Ballaine had given a deed to the said land and put it up as collateral security with the Shedds, as part of the security in consideration of which they had advanced the money to finance the railroad, he considered it was protecting the Shedds to see that the note was paid. He therefore advised Keeler to pay it, and Keeler did so, with funds in his hands belonging to the Tanana Construction Company, upon Colonel Swanitz O. K.'ing the voucher and Keeler charging the said $4,000 to himself as trustee. Upon Frank L. Ballaine's return a week or two later, he, at the request of Mr. Keeler, also O. K.'d or approved the voucher paying said note. John E. Ballaine was advised of this action in paying said note and about three months later, he paid said sum of $4,000 out of his own funds, into the Washington Trust Company, to the credit of the Tanana Construction Company. Later the note given the Shedd Bros., Chicago, by the Ballaines and others, to secure the money advanced by the Shedds to finance the railroad enterprise, was paid, and the said deed for said town site returned to Frank L. Ballaine.

There was a good deal of documentary evidence with reference to the dealings between Dowdle, Shedd Bros., and later with one A. C. Frost, who afterwards became largely interested in said railway enterprise. This great mass of testimony does not tend to throw much light, if any, upon the controversy. It does show that John E. Ballaine at all times took an active part in promoting the said Alaska Central Railway Company and its construction, and it is not an unfair inference that he, as the originator and promoter of such enterprise, not only had a pride and interest in its success, but also sought to protect his own interest in said town site, as the

success of the railway enterprise would necessarily mean the success of his venture and investment in said town site.

The witness John Dowdle, on the part of the plaintiff, who is shown to have some personal feeling against John E. Ballaine, testified that before leaving Chicago, in August, 1903, Colonel A. W. Swanitz being present, John E. Ballaine told said Dowdle that the Alaska Central Railway Company owned the town site of Seward. This is positively denied by Mr. Ballaine; and Colonel Swanitz, also a witness for plaintiff, testified that he never heard or heard of any such conversation, but that, on the contrary, John E. Ballaine at all times claimed he owned the said town site.

Of the original trustees of said Alaska Central Railway Company, Dickinson, Caine, and McGraw are deceased. There is testimony showing that at different times they each received some ten lots from John E. Ballaine in said Seward town site. Counsel for the plaintiff lays great stress upon this as evidence of fraud, arguing that their action was improperly influenced thereby. The undisputed testimony, however, of those present at said meeting, who are still living, to wit, J. W. Godwin, James A. Haight, John E. Ballaine, and Frank L. Ballaine, shows that this was not the case; that the trustees, acting for and on behalf of the corporation, did not feel justified in incurring the expense and in entering into what then seemed to be a more or less speculative and hazardous investment, and the doubt as to the legal right of the railway company to hold and own the town site.

James A. Haight completely and satisfactorily accounts for the deeding to him of some few lots on account of services rendered by him in securing the patent to said land and performing other legal services.

The testimony of John E. Ballaine shows that, at a time when he was endeavoring to finance the said railroad and finding great difficulty in selling the bonds thereof, he prevailed upon J. W. Godwin, E. E. Caine, and Gov. McGraw to purchase two bonds each, at $850 for each $1,000 bond, and agreed to give them as a bonus ten lots each in the town site of Seward. The undisputed testimony further shows that the said lots were in a rather remote portion of the town of Seward, and had little or no value then, except a purely speculative one, and have little or no value now, except a purely speculative one.

5 A.R.—25

There were some printed circulars or prospectuses introduced in evidence by plaintiff, some published as early as the summer of 1902, setting forth in glowing terms the wonderful resources of Alaska and the opportunity there was for a profitable investment. The first one of these prospectuses was issued probably in June, 1902, for the following is found near the end thereof:

"Supplemental—July 1, 1902. Since the publication of this prospectus, all five of the surveying parties to make the permanent survey for the Alaska Central Railway have been sent, and are at work. They will finish before November 1. A sixth party, to begin cross-sectioning, will be sent within a few days. The company will immediately proceed to locate a terminal town site on Resurrection Bay, and other town sites along the route, all of them in the name of the company, the profits from which will accrue to the stockholders pro rata."

There is no evidence of any willful misrepresentation, and it is not to be presumed that the men whose names appear on this prospectus were guilty of any intentional fraud or imposition. At that time it was no doubt the intention to acquire a town site on Resurrection Bay. John E. Ballaine testifies so himself, and that up to as late as July, 1903, he endeavored to have the Alaska Central Railway Company, through its duly authorized officers, take up said town site, and in this he is fully corroborated by other witnesses and in no manner disputed. This statement in the prospectus, together with the Keeler voucher, showing the payment of this $4,000 to Mrs. Lowell, no doubt was largely responsible in causing those who brought this action to believe that they could make out a case against the Ballaines.

Counsel for plaintiff is strenuous in his contention that a great wrong was perpetrated upon those who purchased stock in the Alaska Central Railway Company by reason of this statement in the prospectus. Unfortunately, this is not the only statement in the prospectus which is somewhat exaggerated and overdrawn; but it is one of the unfortunate things about promotion enterprises that glittering promises and inducements are held out to those who might purchase stock. It may be that those who issue it believe in the truth of the statements; but it too often happens that such statements are not either conservative or strictly truthful, however much the enthusiasm of the promoters may lead them to believe it. In

this case, however, the undisputed testimony shows that about the year 1905, one A. C. Frost came into control of the said enterprise, that he and his associates bought up all of the stock that had been sold which they could find, and that nearly all those who had bought stock sold same back to Frost and his associates at a profit.

It is not claimed that Frost or any of his associates were ever deceived into believing that said town site belonged to the railway company, and no presumption to that effect can be indulged.

The testimony shows that the Ballaines deeded to the Alaska Central Railway Company all necessary right of way through the town site for railway purposes; also a tract of about seven acres for depot grounds and a number of lots for office and other building purposes. These deeds were accepted by the Alaska Central Railway Company, and upon the transfer of all this property to the plaintiff, the Alaska Northern Railway Company, the latter company received and accepted the same.

The Alaska Central Railway Company, when it filed its plats and profile of its official survey, located and acquired from the government certain tracts and riparian rights adjacent to the land in controversy.

Before the plaintiff could succeed in an action of this kind, it must sustain the allegations of its complaint by clear and convincing proof. This it has wholly failed to do. It has completely failed in its allegation that the soldier's additional homestead scrip was paid for by funds other than those belonging to John E. Ballaine. The $4,000 was paid Mrs. Lowell on the responsibility of Mr. Keeler himself, as he testifies, not by request or procurement of John E. Ballaine or Frank L. Ballaine, and was repaid by John E. Ballaine. The plaintiff, however, still contends that the fiduciary relations of both John E. and Frank L. Ballaine to the Alaska Central Railway Company and the Tanana Construction Company were such that they could not acquire interests adverse to or prejudicial to the rights of the said company, assuming that the acquiring of said town site was adverse to the railway company. While it is true that fraud will never be presumed, but must be proved by clear and unambiguous evidence, yet this rule is sometimes modified in cases where one holding a fiduciary relation takes advantage of such position to acquire benefits for himself, which ought in equity and good conscience to belong to the

person or corporation toward whom such fiduciary relationship exists, and the acts of such persons will be scrutinized very closely before they will be permitted to acquire such interests.

I have considered this case, however, very carefully, and I am satisfied that there is nothing in the conduct of John E. Ballaine or Frank L. Ballaine in this case that savors in any manner of unfairness, deception, or taking advantage of the Alaska Central Railway Company or the Tanana Construction Company, or acquiring property adverse to the interest of or prejudicial to said railway company. There is not a particle of proof that either John E. or Frank L. Ballaine were charged with the duty of locating or acquiring town sites or other lands for said railway company, and presumably its chief engineer, or locating engineers, were employed to perform such duties.

The said railway company, through the only officers through whom it could act, refused to take said town site, although John E. Ballaine desired and requested them to do so. At that time, in addition to the lack of funds, they were aware that there was a legal doubt as to the right of the railway to hold land for speculative purposes, and, if they were familiar with public land matters, they may have known that there were other difficulties and objections in seeking to acquire title to such lands. The history of such cases in Alaska has been that one seeking to acquire title to lands which are supposed to have some speculative value has had to contend with jumpers and holdups and claims of many kinds; that their claims may be and often have been rejected by the government, and their application for patent refused, and this after the expenditure of much time and money. It might well have been that, had the railway company sought to take over and acquire title to this land, it would have been a matter of great loss and expense to the company. They may have had to contend with jumpers and squatters, lawsuits, and protests filed against their application for patent, so they never could have acquired title. This is one of the risks that the Ballaines ran in undertaking to acquire title to this land. Furthermore, at the time that the Ballaines took up this land, the railway company might have acquired other land, a distance anywhere from a mile to ten miles therefrom, where dock sites had been mapped out and platted in 1902. One or more rival town sites might

have sprung up, and with the expenditure of money by the promoters might have succeeded in causing the town to build elsewhere than where it did.

Counsel for the plaintiff is very earnest in his insistence that, because there were no minutes kept of the meeting of the board of trustees at the time they talked over the matter of the town site with John E. Ballaine in July, 1903, it is evidence of a secret plot or conspiracy on the part of the board of trustees to defraud the stockholders of the company, and turn over the town site to Ballaine, who afterwards rewarded them by giving them lots. The lips of three of these trustees are closed in death. This is one of the reasons why stale demands are not favored in law. Those living testify there was absolutely no thought of such a thing, and the witness John E. Ballaine, when interrogated as to why no such minutes were kept, pertinently replied, that "they kept minutes of what they did, not of what they did not do." This seems a reasonable explanation, and no presumption of fraud will be indulged in this respect. This is one of those cases where the personal interest and bias of those claiming with the plaintiff draw such conclusions from the facts as will tend to bolster up and confirm their case, and their suspicions.

> "All seems infected, that the infected spy;
> As all looks yellow to the jaundiced eye."

To the impartial and unprejudiced mind, fully informed as to all the facts and circumstances surrounding this case, there can be but one conclusion—that the plaintiff has signally failed to sustain the allegations of its complaint.

Counsel for the plaintiff in his brief cites Seacoast R. Co. v. Wood, 65 N. J. Eq. 530, 56 Atl. 337, footnote on page 184 of 39 Cyc., as follows:

"Where a contractor, in purchasing lots for building a railroad, bought certain lots for terminal purposes in the same manner that he purchased the right of way and built the road as projected, so as to embrace and enter the terminal which thus became an essential part of the road, he is precluded from asserting that the terminal properties did not become a part of the road and setting up a personal right therein."

Plaintiff also cites the case of Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176, as follows:

"And, within the prohibition of this rule of law, every relation in which the duty of fidelity to each other is imposed upon the parties

by the established rules of law is a relation of trust and confidence. The relation of trustee and cestui que trust, principal and agent, client and attorney, employer and an employé, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of the relation. From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his cestui que trust, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created."

These cases might be in point if the Ballaines had been such officers, agents, or employés of the Alaska Central Railway Company, or the Tanana Construction Company, as to charge them with the duty of locating, purchasing, or acquiring lands for either of said companies. But there is no testimony in this case to that effect. The clear preponderance of the testimony shows that, while both Frank L. and John E. Ballaine were directors or members of the board of trustees of the Alaska Central Railway Company and the Tanana Construction Company, they had no control over the funds of either; and each of said companies had on its board of directors or trustees men of unquestioned business standing and integrity, who were not dominated or controlled by the Ballaines.

Plaintiff further cites in his brief 39 Cyc. pp. 191 and 192, as follows:

"The burden of proving fraud, actual or constructive, necessary to give rise to a constructive trust is upon the person alleging the existence of such a trust. But where a prima facie case of constructive fraud is made out from the fiduciary relationship of the parties and other circumstances connected with the transaction, the burden of affirmatively proving good faith is upon the party denying the existence of the trust."

This is no doubt a correct statement of the law. I have carefully considered the question as to the burden of proof, and feel satisfied that, even though the burden of proof were shifted to the defendants to explain their actions, they have fully and satisfactorily done so by a clear preponderance of the testimony.

There are some side issues which were introduced in this case, which it is unnecessary to discuss, as it would not tend to make clear, but rather complicate and confuse, the main issue. The salient and essential features of the case have been above set forth, and I can reach no other conclusion than that the plaintiff take nothing by this action, and the plaintiff's complaint be dismissed, as well as the complaints in intervention. Findings and decree may be prepared accordingly.