## BURRAGE v. SMITH et al.

(Circuit Court of Appeals, Fifth Circuit. April 1, 1927.)

No. 4754.

1. Corporations ⬡560(12)—Charges of fraud in transactions between railroad and terminal companies and their fiscal agent held not sustained.

Charges of fraud in transactions between closely allied corporations, made in a suit between receivers for the service corporations, *held* not sustained.

2. Corporations ⬡478—Lease for adequate rental held not breach of covenant not to incumber property in note indenture.

A lease of right of way over its property by a corporation, which was expected to be profitable to it, and for which adequate rental was received, cannot be considered in breach of a covenant against incumbering the property in an indenture securing its notes.

3. Principal and agent ⬡69(6)—Agent, buying property for himself with his own money, cannot be compelled to convey to principal.

Agent, who with his own money buys property for himself, cannot be compelled to convey it to his principal.

Appeal from the District Court of the United States for the Southern District of Georgia; William H. Barrett, Judge.

Suit in equity by Paul J. Burrage, as receiver, of the Port Wentworth Terminal Corporation, against Theodore G. Smith and John B. Johnson, individually and as receivers of Imbrie & Co., and others. Decree for defendants, and complainant appeals. Affirmed.

George T. Cann, of Savannah, Ga., William M. Evarts, of New York City, and Barton Corneau, of Boston, Mass. (Anderson, Cann & Cann, of Savannah, Ga., Murray, Aldrich & Roberts, of New York City, and Channing, Corneau & Frothingham, of Boston, Mass., on the brief), for appellant.

Robert M. Hitch, R. L. Denmark, and A. B. Lovett, all of Savannah, Ga., Chas. P. Spooner, of New York City, and S. B. Adams and A. P. Adams, both of Savannah, Ga., A. B. Rowe, of Palmetto, Fla., Herman E. Riddell and Mark Hyman, both of New York City (Rabenold & Scribner, of New York City, on the brief), for appellees.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. This is an appeal from a final decree dismissing a bill of complaint filed by leave of court in a receivership suit. The bill was based on the alleged fraud of Imbrie & Co. in three separate and distinct transactions. Jurisdiction was entertained in a single suit, because the District Court, through its various receivers, including the receivers of Imbrie & Co., was in possession of the subject-matters in controversy. Prior to their failure in March of 1921, Imbrie & Co. were investment bankers. In 1913 they became the principal stockholders of the Brinson Railway, whose name in 1915 was changed to Savannah & Northwestern Railway, and later was merged in the Savannah & Atlanta Railway. The line of railroad was so extended that by 1917 it reached from Savannah to Camak, Ga., and connected at the latter place with the Georgia Railway. By that time, Imbrie & Co., owned all of the common stock and three-fifths of the preferred stock of the Savannah & Atlanta Railway. They acquired from a lumber company a 3,000-acre tract of undeveloped land at Port Wentworth on the Savannah river about six miles above Savannah, and a spur track about three miles long, which connected with the track of the railway at Newtonville. This spur track is referred to in the record as the Newtonville lead. The objects of the purchase of the Port Wentworth property were to secure a tidewater terminal, develop industries, provide tonnage for the railway, and thus increase its business with its connecting and other railroad companies. To accomplish these objects, the Port Wentworth Terminal Corporation was organized, and several industrial enterprises were located on the water front. Industrial tracks were built which connected the industries with the Newtonville lead, and by means of it with the railway. The railway owned all the stock of the terminal corporation, and Imbrie & Co. were fis-

cal agents for both. The directors of the terminal corporation were either members or employees of the firm of Imbrie & Co. or directors of the railway. In 1921 Imbrie & Co., the railway company, and the terminal corporation were all placed in the hands of receivers.

The following are the questions raised on this appeal, and the essential facts in the light of which those questions must be decided:

(1) Did the District Court err in refusing to set aside a 99-year lease from the terminal corporation to the railway of the Newtonville lead and the industrial tracks on the Port Wentworth property? That lease, though dated December 31, 1917, was not actually executed until March of 1918. It was not authorized by the board of directors of the terminal corporation, but was recorded, and a subsequent mortgage, executed October 1, 1920, by that corporation, to the Equitable Trust Company, and approved by its board of directors and stockholders, was made subject to it by specific reference to its date and the book in which it was recorded; and the rent reserved by the lease was accepted by the terminal corporation up until the time it was placed in the hands of a receiver, and has since been accepted by its receiver. The railway operated the industrial tracks from the beginning, and it was always the intention of all the parties interested that the terminal property should be used for the benefit of the railway. To carry out that intention, the railway also, on December 31, 1917, conveyed the Newtonville lead to the terminal corporation, and the latter included in its lease both the Newtonville lead and the industrial tracks. The consideration to the railway for its deed of the Newtonville lead was $101,500 of the terminal corporation's notes, which Imbrie & Co. received and credited on that corporation's indebtedness to them.

It is claimed that the Newtonville lead was covered as after-acquired property by a previous mortgage of the Brinson Railway, and that Imbrie & Co. could and should have secured a release under a clause of that mortgage. The railway never applied for the release, because it did not have the money with which to pay for it, and for that reason the deed to the Newtonville lead was withheld from record. On October 1, 1917, in order to raise funds to repay advances made by Imbrie & Co., the terminal corporation issued notes for $700,000, payable in three years, and also issued participation certificates of the par value of $100 each, which entitled the holders to its net earnings until they should equal in amount the par value of the certificates. Imbrie & Co. took the notes and some of the certificates and sold them to the general public. The indenture, under which the notes were issued, provided that no mortgage or other incumbrance should be placed on any of the real property of the terminal corporation until all the notes were paid, and that, if any of that corporation's real property should be sold, the proceeds should either be deposited with the trustee under the note indenture or invested in property to be kept free from incumbrance. At the maturity of these notes on October 1, 1920, the terminal corporation executed its above-mentioned mortgage to the Equitable Trust Company, to secure an issue of $2,000,000 of bonds on all its real estate. Of these bonds, $1,000,000 were issued, Imbrie & Co. took $800,000 face value, and agreed with the terminal corporation to exchange bonds for notes issued in 1917, and all the notes except $74,500 were either paid or exchanged for bonds. The lease provided that the railway should pay all taxes on the leased property, pay for the upkeep of the tracks, and 7 per cent. upon the cost thereof. At the time of the receiverships about 40 per cent., or seven miles, of the industrial tracks were producing revenue to the railway, and it was paying at the rate of $19,000 annually to the terminal corporation, besides $10,000 for taxes and upkeep, a gross annual rental of over $4,000 per mile of tonnage producing track. The testimony was undisputed that the rental was fair for the service received, although it was insufficient to enable the terminal corporation to meet its obligations.

(2) Did the District Court err in refusing to set aside a deed by which the terminal corporation conveyed 75 acres of land at Port Wentworth to the Cuban-Atlantic Transportation Company? In the winter of 1919–20 Imbrie & Co.'s manager at Savannah recommended to them the building of terminal facilities at Port Wentworth to be so equipped as to provide facilities for the shipment of coal to Cuba and as to receive sugar from Cuba. At that time there was a great demand for sugar in the United States. There was already in existence a corporation known as the Cuban Atlantic Transport Corporation, the stock in which was held by Garcia, Guidera, and James, who severally agreed to supply the sugar, the necessary coal barges, and the coal. In reliance upon their representations, it was agreed that the transport corporation would convey all its assets, subject to liabilities, to a new corporation. Pursuant to that agreement, a new corporation, the Cuban-Atlantic

Transportation Company, was organized, with a capitalization of $500,000 first preferred stock, $150,000 second preferred stock, and 20,000 shares of common stock without par value. For the purpose of providing a site for the proposed terminal and warehouse, the terminal corporation conveyed to the Cuban-Atlantic Transportation Company the 75 acres of land in question, and was to receive as consideration for its deed all the second preferred stock and all the common stock, out of which it expected to realize $170,000. Thereupon bonds to the amount of $210,000, secured by a first mortgage on all the company's assets, including the 75 acres of land, were taken by Imbrie & Co. at $189,000. The proceeds were used to pay off various obligations, including a mortgage of $60,000 on one of the barges, and about $100,000 for boats purchased from the Emergency Fleet Corporation. It soon became apparent that the transport corporation had not been operated profitably as claimed, but at a considerable loss. By that time, Imbrie & Co. and their Savannah manager had advanced about $260,000. They refused to make further advances, and the venture proved to be a failure. None of the preferred or common stock was ever issued.

(3) Did the District Court err in refusing to decree that the terminal corporation was the beneficial owner of a 500-acre tract of land acquired by Imbrie & Co.? This land is referred to in the record as the Foundation tract. It is situated on the Savannah river, but does not adjoin the Port Wentworth property. It was used during the World War by the Foundation Company as a site for the construction of ships for the French government. In 1920 Imbrie & Co. were considering the purchase of this tract for use in connection with the export of coal, and were in negotiations with French capitalists. It had a greater depth of water than the Port Wentworth tract, and in August of 1920 Imbrie & Co. purchased it for $175,000. They entered into negotiations to sell part of it to a coal and dock company for $100,000, and afterwards offered to sell the rest of it to the terminal corporation for $175,000. There was some effort made to show that the terminal corporation delivered to Imbrie & Co. $200,000 of its bonds in payment for this tract of land, but that effort failed. The president of that corporation, who, although he was a member of the firm of Imbrie & Co., was the chief witness for appellant, admitted that the bonds were furnished in payment of other indebtedness, and testified it was the intention to issue

additional bonds of his corporation for $200,000 face value, that the coal and dock company would issue its purchase-money mortgage for $100,000, and that Imbrie & Co. would take the bonds and mortgage, at a cash valuation of $275,000, as the consideration to them for the Foundation tract. The whole plan fell through. The contemplated sale to the coal and dock company was never made, and consequently it never executed a purchase-money mortgage. The legal title to the Foundation tract remained in Imbrie & Co.

[1] The District Judge heard the testimony, which was voluminous, and, after it was concluded, stated in a written opinion:

"Not only does the testimony fail to establish the charges of fraud, but the court is convinced that Imbrie & Co., and those who were advising them, acted with honest purpose throughout. This conviction does not prevent the further conviction that in some cases proper care was lacking, as in failing to arrange for the release of the Newtonville track from the lien of the mortgage of the Brinson Railway before any attempt at consummating its sale, in failing to make certain the provision for all of the three-year notes before issuing the mortgage bonds; and in at least one case there was undue haste, with resultant disaster—i. e., the Cuban-Atlantic Transportation Company transaction. But in none of these was there any dishonest purpose and in the latter at least Imbrie & Co. suffered a tremendous direct and immediate loss in addition to the indirect losses they suffered whenever the terminal corporation lost. It must not be forgotten, in the consideration of every aspect of this case, that all of the stock of the terminal corporation was owned by the Savannah & Atlanta Railway, and that in turn Imbrie & Co. owned the large majority of the stock of said railway. Therefore loss to the terminal corporation meant loss to Imbrie & Co. Imbrie & Co. may have been too sanguine, but their ever-present faith was evidenced by their continuing financial support."

We agree with the District Judge, for the reasons stated by him, that actual fraud was not shown. The transactions complained of are of a kind that are not unusual in the relations between closely allied business corporations. At last, the terminal corporation was only a subsidiary of the railway. But it is contended by appellant that the averments of the bill are broad enough, and the proof is sufficient, even in the absence of intentional wrongdoing, to show that Imbrie & Co., while acting in a fiduciary capacity, handled the affairs of the terminal corporation for their

own benefit and profit, with resulting injury to it, its security holders and other creditors. Assuming that appellant's construction of the bill is correct, we also agree with the District Judge that the evidence fails to show such breach of fiduciary relationship as to authorize the relief prayed in regard to any of the transactions of which complaint is made.

[2] 1. As to the lease: It is clear that the railway never intended to lose control of the Port Wentworth property, which it had long before acquired as a means of gaining access to a terminal on the Savannah river. The deed of the Newtonville lead, and the lease of it and the industrial tracks, bear the same date, and were intended to be parts of a single transaction. The lease, although not authorized by the board of directors, was ratified by them as well as by the stockholders of the terminal corporation, by long afterwards making a mortgage subject to it, and by accepting rent for a period of years. The terminal corporation's title to the Newtonville lead has not yet failed, because of the existence of the Brinson mortgage. The same District Court is in possession through receivers of both the railway and the terminal corporation, and has the power to protect the title to the Newtonville lead against the lien of the mortgage, if necessary, by authorizing receiver's certificates in order to secure continued operation of the properties under its control. Miltenberger v. Railway Co., 106 U. S. 286, 1 S. Ct. 140, 27 L. Ed. 117. The principle is the same, whether the court authorizes an issue of eceiver's certificates, or, to the extent that is necessary, protects the lease against the lien of the mortgage. It is true that the reasonableness of the rentals reserved by the lease are to be carefully considered, because of the interlocking directorates and the interest and influence of Imbrie & Co.; but, notwithstanding that, it is undisputed that a fair rental is being paid. The situation is to be viewed as it existed at the time the lease was entered into, when it was believed that it would become profitable to the terminal corporation by reason of the expected development of its property. The lease cannot justly be considered as an incumbrance within the meaning of the note indenture of 1917, by reason of the fact that notes amounting to $74,500 are still outstanding. The incumbrance provided against in the note indenture was one similar to a mortgage. It would be extreme to say that reference was made to a lease that might become desirable in developing the terminal property.

2. As to the Cuban-Atlantic Transportation Company transaction: The good faith of Imbrie & Co. in this matter is not seriously questioned. But it is said that they acted in haste, caused the terminal corporation's deed to be delivered before any stock was issued, and were careful to take security for themselves. Prompt action was thought to be necessary, and there was nothing to indicate that Imbrie & Co. took any advantage of the terminal corporation. The venture that it was hoped by all would yield a large profit resulted in a serious loss. Imbrie & Co. took security, it is true, but they are the only ones connected with the transaction who advanced any money. The situation is not different than it would have been if the terminal corporation had itself borrowed the money and pledged its land as security.

[3] 3. Imbrie & Co. did not purchase the Foundation tract as agents of the terminal corporation, but for themselves, in order to provide a terminal for the coal and dock company which they expected to organize. The terminal corporation did not supply the purchase price, and has never paid anything for the property. The only contract right it could possibly assert was to acquire title upon the payment of a profit to Imbrie & Co. It cannot at one and the same time enforce a contract to convey and refuse to pay the purchase price agreed upon. Burland v. Earle, 1902 A. C. 83. Appellant does not rely on the contract as made, but invokes the universally recognized rule that an agent will not be permitted to make a secret profit at the expense of his principal. That rule is violated where a trustee is the agent, and takes title in his own name to property which he paid for with money of his cestui que trust, or where a director buys and with his own money pays for property for the use of the corporation he represents, and then makes or contracts for a secret profit in the sale of that property to the corporation. In the one case, the cestui que trust is entitled to the property bought with its money, and, in the other, has the option to recover the secret profit or to rescind the sale. Cases in each of these classes are cited by appellant. It is to be noted that they relate to consummated transactions, and in that particular are different from the case at bar. In Seacoast R. Co. v. Wood, 65 N. J. Eq. 530, 56 A. 337, the suit was to compel conveyance and an accounting of profits upon a sale to the railroad company. In Parker v. Nickerson, 112 Mass. 195, the suit was to recover from directors the profits they had made in the purchase of a ferryboat and the resale of it to their corporation. In Tyrrell v. Bank

of London, 10 H. L. Cas. 26, the suit was to compel an accounting of profits on a resale to the corporation. None of those cases goes to the extent of holding that an agent, who with his own money has bought property for himself, and not for his principal, can afterwards be compelled to convey that property to his principal.

The decree is affirmed.